## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **M.M.,** *et al.*, | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) |
| v. | )     **Civil Action No. 07-2316 (HHK)** |
|  | ) |
| **DISTRICT OF COLUMBIA,** *et al.*, | ) |
|  | ) |
| **Defendants.** | ) |
|  | ) |

## ADMINISTRATIVE RECORD

Attached is an index and the record of the administrative proceedings at issue in this action.

Respectfully submitted,

PETER NICKLES
Acting Attorney General for the District
 of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/ *Edward P. Taptich*
EDWARD P. TAPTICH [012914]
Chief, Equity Section 2

/s/ *Juliane DeMarco*
JULIANE DEMARCO [490872]
Assistant Attorney General
441 4th St., N.W., Sixth Floor South
Washington, D.C. 20001
Tel. - (202) 724-6614
Fax. - (202) 727-3625

July 25, 2008

## Index of Record

| | | Page |
|---|---|---|
| 1. | Hearing Officer's Certification of Record | 1 |
| 2. | HOD, 9/21/07 | 2-10 |
| 3. | HOD, 4/26/07 | 11-23 |
| 4. | Due Process Complaint Notice, 7/5/07 | 24-29 |
| 5. | Scheduling Memorandum, 7/5/07 | 30-33 |
| 6. | Request for Hearing, 8/6/07 | 34 |
| 7. | Hearing Notice, 8/15/07 | 35-37 |
| 8. | Student's Disclosure Letter dated 8/24/07 w/att.,[1] | 38-40 |
| 9. | MM-02 MDT Meeting Notes, SEP & Consent Form, 6/5/07 | 41-46 |
| 10. | MM-03 IEP 1/23/06 | 47-51 |
| 11. | MM-23 Comp. Psycho-educational Evaluation, 9/06 | 52-70 |
| 12. | Hearing Notice, 8/31/07 | 71-73 |
| 13. | Interim Order, 8/31/07 | 74 |
| 14. | Transcript of Hearing, 9/12/07 | 75 *et seq.* |

---

[1] See Hearing Officer's Certification of the record dated 6/24/08. Exhibits 2, 3, and 23 were the only exhibits attached to the Student's Disclosure letter that were included in this record.

**Terry Michael Banks**
**Attorney at Law**
**1303 Sawbridge Way**
**Reston, Virginia 20194**

Admitted in D.C. and Va.

Cell: (571) 437-7381
Fax: (703) 709-0745
Tmbanks1303@earthlink.net

June 24, 2008

District of Columbia Office
   of the State Superintendent of Education
Office of Review and Compliance
Student Hearing Office
1150 - 5th Street, S.E.; Room 3
Washington, D.C. 20003

Dear Sir or Madam:

     Re: M██████M██████, Date of Birth: ██████1996

    Inasmuch as I rendered a Hearing Officer's Decision on September 21, 2007 as the Hearing Officer in the matter referenced above, enclosed is the entire record made before me. It includes the following:

1. Due Process Complaint Notice dated July 5, 2007.
2. Petitioner Exhibits Nos. 2, 3, and 23.
3. A CD of the hearing held on September 12, 2007.

    I hereby certify that this Administrative Record is true, correct and complete. Should you have any questions, please do not hesitate to contact me. Thank you.

Very truly yours,

Terry Michael Banks
Hearing Officer

1

# District of Columbia Public Schools

## State Enforcement and Investigation Division

**Terry Michael Banks, Due Process Hearing Officer**
1150 - 5th Street, S.E.; Room 3
Washington, D.C. 20003
(571) 437-7381
Facsimile: (202) 689-3825

## Confidential

| | |
|---|---|
| M▮▮▮▮▮ M▮▮▮▮▮, STUDENT ) | |
| ) | Hearing Date:  September 12, 2007 |
| **Date of Birth:** ▮▮▮▮, 1996 ) | |
| ) | |
| **Petitioner,** ) | Complaint Filed: July 5, 2007 |
| ) | |
| **v.** ) | |
| ) | |
| **THE DISTRICT OF COLUMBIA** ) | |
| **PUBLIC SCHOOLS** ) | |
| ) | Held at: 1150 - 5th Street, S.E. |
| **Respondent.** ) | Washington, D.C. 20003 |
| ) | |
| **Student Attending:** ) | |
| **Options Public Charter School** ) | |

### HEARING OFFICER'S DECISION

| | |
|---|---|
| **Parents:** | Mr. Sharon Matthews, Mother |
| | 3685A Jay Street, N.E.; #201 |
| | Washington, D.C. 20019 |
| | |
| **Counsel for Petitioner:** | Fatmata Barrie, Esquire |
| | 1003 K Street, N.W. |
| | Suite 500 |
| | Washington, D.C. 20001 |
| | (202) 626-0040; Fax: (202) 626-0048 |
| | |
| **Counsel for DCPS:** | Aaron E. Price, Esquire |
| | Office of the General Counsel, DCPS |
| | 825 North Capitol Street, N.E.; 9th Floor |
| | Washington, D.C. 20002 |

An index of names is attached hereto for the benefit of the parties. The index will permit the parties to identify specific witnesses and other relevant persons. The index is designed to be detached before release of this Decision as a public record.

## INDEX OF NAMES

| Child | M█████ M███████ |
|---|---|
| Child's Parent(s) (specific relationship) | Sharon Matthews, Mother |
| Child/Parent's Representative | Fatmata Barrie, Esquire |
| School System's Representative | Aaron E. Price, Esquire |
| Psychologist | Dr. Kara Covington, Children's National Medical Center |
| Principal or Designee | David Clarke, Admissions Director, High Road School of Washington, D.C. |

3

**Jurisdiction**

This hearing was conducted in accordance with the rights established under the Individuals With Disabilities Education Improvement Act of 2004 ("IDEIA"), 20 U.S.C. Sections 1400 et seq., Title 34 of the Code of Federal Regulations, Part 300; Title V of the District of Columbia ("District" or "D.C.") Municipal Regulations ("DCMR"), re-promulgated on February 19, 2003; and Title 38 of the D.C. Code, Subtitle VII, Chapter 25.

**Introduction**

Petitioner is an eleven year-old student attending Options Public Charter School ("Options"). On December 13, 2006, Petitioner filed a Due Process Complaint Notice alleging that the District of Columbia Public Schools ("DCPS") had failed to (1) comply with the terms of a Hearing Officer's Decision ("HOD"), (2) develop an appropriate Individualized Education Program ("IEP"), (3) provide necessary services, (4) provide an appropriate placement, (5) evaluate Petitioner in all areas of suspected disability, (6) allow Petitioner's parent the opportunity to participate in a placement meeting, (7) provide Petitioner's parent notice of her due process rights, and (8) provide compensatory education services. The due process hearing was convened on February 9, 2007 and concluded on April 9, 2007. On April 26, 2007, this Hearing Officer issued an HOD concluding that Petitioner had failed to meet her burden of proof as to any of the allegations in the Complaint, and dismissed the Compliant with prejudice. Nevertheless, the Hearing Officer ordered DCPS to convene a Multidisciplinary Team ("MDT") meeting on or before May 18, 2007 to develop a Student Evaluation Plan ("SEP").[1]

On July 5, 2007, Petitioner filed a Due Process Complaint Notice ("*Complaint*") alleging that the District of Columbia Public Schools ("DCPS") had failed to (1) develop an appropriate IEP, (2) provide necessary related services, (3) provide an appropriate placement, (4) evaluate Petitioner in all areas of suspected disability, and (5) provide compensatory education services. On September 12, 2007, the day for which the due process hearing was scheduled, the parties orally agreed to settle the case. Shortly thereafter, counsel for DCPS learned of the April 26, 2007 HOD. He rescinded the settlement agreement and insisted that the due process hearing be convened. The due process proceeding was convened later that day. Petitioner's Five-Day Disclosure Notices was admitted into evidence at the inception of the hearing. DCPS failed to submit a Disclosure Notice, thereby waiving its right to introduce any evidence at the hearing.[2] The parties stipulated that claims arising prior to April 26, 2007 were barred from relitigation by *res judicata*.

---

[1] April 26, 2007 HOD at 9-10.
[2] 34 C.F.R. §300.512(a)(3).

**Witnesses for Petitioner**[3]

> Dr. Kara Covington, Psychologist, Children's National Medical Center
> David Clarke, Admissions Director, High Road School of Washington, D.C.

**Witnesses for DCPS**

> None

**Findings of Fact**

1. Petitioner is an eleven year-old student attending Options.[4]

2. On September 28, 2006 Dr. Kara Covington of Children's National Medical Center ("CNMC") completed a Comprehensive Psychoeducational Evaluation of Petitioner. Dr. Covington's findings and recommendations, *inter alia*, included the following:

> Results of the cognitive assessment indicated overall Low Average ability (fourteenth percentile) with Average perceptual reasoning ability (thirteenth percentile) and processing speed (twenty-seventh percentile), and Low Average working memory (eighteenth percentile) and verbal comprehension (thirteenth percentile), which was commensurate with her performance on the WISC-IV Perceptual Reasoning Index. Assessment of her oral language skills revealed Average immediate story memory with Below Average delayed story memory… Her phonological processing was in the Poor to Very Poor range for manipulating sounds and blending words. Given [Petitioner's] Low Average Verbal Comprehension Index score and impaired performance on phonological processing measures, a speech and language evaluation is warranted. She demonstrated Above Average visual perceptual ability with Below Average motor coordination and Low visual-motor integration, an occupational therapy evaluation is warranted.

> Results of the achievement testing indicated academic skills which varied from Low to Average. [Petitioner] demonstrated Low sight word identification and word attack skills in an untimed format. Her word reading efficiency was equally deficient while a supplemental test of phonetic and word analysis skills indicated the need for systematic instruction across a range of decoding skills. [Petitioner's] reading fluency fell in the Low Average range as did her literal reading

---

[3] Because she believed the case had been settled, Petitioner's mother left the premises before the hearing was convened. Petitioner's counsel attempted to reach Petitioner's mother by telephone to solicit her testimony, but was unable to reach her. Petitioner's counsel declined the Hearing Officer's offer to continue the hearing to afford Petitioner's mother the opportunity to testify.

[4] *Complaint* at 1.

comprehension when measured at the sentence level using a fill-in-the-blank format… Her poor phonological processing is interfering with the development of her basic reading and spelling skills. While her basic calculation skills fall within age expectations, [Petitioner] is having difficulty with applied problem solving. A speech-language evaluation would help clarify whether her weak reading comprehension, written expression, and math problem-solving are a function of her difficulties comprehending language or result from her poor reading skills.

Results of norm-based rating scales completed by [Petitioner's] teacher are consistent with a diagnosis of Attention-Deficit/Hyperactivity Disorder – Inattentive Type. However, given [Petitioner's] significant academic deficiencies, it is not clear if her symptoms reflect a biologically-based disorder of attention or have developed in response to her struggles in learning… [Petitioner] would benefit from individual therapy to assist her in understanding her learning difficulties and to help her develop more effective coping skills.

RECOMMENDATIONS

… [Petitioner] would benefit from a small, supportive, structured class environment with a small student-teacher ratio that is designed to meet the needs of students with specific learning disabilities in reading and written language. She requires a high degree of structure, support, and positive feedback in order to be successful. A separate program should also provide the related services (e.g., speech and language therapy, occupational therapy, and counseling) that may be necessary for [Petitioner] to derive educational benefit.[5]

3. On June 6, 2007, DCPS convened a MDT meeting to develop an SEP. DCPS agreed to conduct an occupational therapy evaluation and a speech and language evaluation. The parties disagreed as to the need for a psychiatric evaluation.[6]

**Conclusion of Law**

1. In the April 26, 2007 HOD, this Hearing Officer found insufficient evidence to prove that DCPS had received a copy of Dr. Covington's September 28, 2006 evaluation when it convened an MDT meeting on December 6, 2006:

> The only evidence in the record that would support the need for additional evaluations is the CNMC Psychoeducational Evaluation. In that very thorough evaluation, the psychologist provided ample justification for an occupational evaluation and a speech and language evaluation, neither of which were requested by Petitioner's counsel. And, as noted above, there

---

[5] P.Exh. No. 23 at 10-11.
[6] P.Exh. No. 2.

was no offer of proof that DCPS received this evaluation prior to the December 6, 2006 MDT meeting.[7]

The Hearing Officer concluded that Petitioner had failed to meet her burden of proving that DCPS had failed to evaluate her in all areas of suspected disability. However, the Hearing Officer expressed his opinion that Petitioner required the evaluations recommended by Dr. Covington and ordered DCPS to convene an SEP.

> This hearing officer believes that Petitioner should receive the evaluations recommended by CNMC, and that an MDT meeting should be reconvened thereafter to consider the findings and recommendations contained in the CNMC evaluation and Dr. Covington's evaluation. To avoid the result reached in *T.S.*, and despite the apparent authority granted in 34 C.F.R. Section 300.513(a)(3), the hearing officer will not order DCPS to take these steps. The hearing officer will, however, order the parties to reconvene an MDT meeting to determine the need for further evaluations.[8]

DCPS convened an MDT to develop an SEP on June 6, 2007. The MDT agreed to conduct the occupational therapy ("OT") and speech and language ("S/L") evaluations that were recommended by Dr. Covington. Petitioner filed her *Complaint* one month later. However, Petitioner has offered no showing of any act or omission by DCPS that would constitute a violation of IDEIA. Certainly it was not a violation to fail to complete the evaluations and convene another MDT meeting in the thirty-day period before the *Complaint* was filed on July 5th. And since no meeting was held between June 6th and July 5th, DCPS did not unlawfully change Petitioner's IEP or placement. Therefore, the Hearing Officer concludes that Petitioner has failed to meet her burden of proving that DCPS took any action or declined to take any action that violated IDEIA between April 26, 2007, when the previous HOD was issued, and July 5, 2007, when the *Complaint* was filed.

Nevertheless, the Hearing Officer notes that DCPS failed to file a response to the *Complaint*, failed to convene a Resolution Session meeting, failed to prepare disclosure documents in preparation for this hearing, and failed to offer even a proffer as to when the evaluations that were ordered three months ago would be concluded. Since DCPS is obligated to convene a meeting to review Petitioner's evaluations upon their completion, the Hearing officer does not believe that it would be inappropriate to set a deadline for that meeting in light of his familiarity with the developments to this point. In the recent case of *T.S.* v. *District of Columbia*,[9] Hearing Officer Ruff ordered DCPS to fund an independent evaluation even though the hearing officer had concluded that DCPS had not violated any statutory or procedural obligations. The court determined that the petitioner was the prevailing party, because the hearing officer had ultimately granted the relief requested in the Complaint. In this case, Petitioner's counsel requested the Hearing Officer to place Petitioner at High Road Primary Academy, a private special education

---

[7] April 26, 2007 HOD at 9.
[8] *Id.* at 11.
[9] Civil Action No. 05-00861 (D.D.C. March 27, 2007).

6

school. Since the Hearing Officer is ordering relief far short of a private placement, the mandate of *T.S.* has not been violated.[10]

    2. There is no prevailing party in this proceeding.

**ORDER**

Upon consideration of Petitioner's request for a due process hearing, Petitioner's Five-Day Disclosure Notices, the testimony presented at the hearing, and the representations of the parties' counsel at the hearing, this 21st day of September 2007, it is hereby

**ORDERED**, that the *Complaint* is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED, ORDERED,** that on or before October 5, 2007, DCPS shall provide Petitioner's counsel copies of the completed OT and S/L evaluations.

**IT IS FURTHER ORDERED,** that in the event DCPS fails to provide the evaluations on or before October 5, 2007, Petitioner shall obtain independent evaluations in accordance with 5 D.C.M.R. Section 3027.5. Petitioner's counsel shall notify the appropriate DCPS Placement Specialist of Petitioner's intent to obtain independent evaluations by facsimile transmission and first-class mail. Petitioner's counsel shall provide copies of the completed evaluations to the appropriate DCPS Placement Specialist and the DCPS Office of Mediation & Compliance by facsimile transmission and first-class mail along with a written request to schedule the MDT meeting described below.

**IT IS FURTHER ORDERED,** that DCPS shall convene an MDT meeting within fifteen (15) days of its delivery of the evaluations to Petitioner's counsel or within fifteen (15) days of its receipt of the independent evaluations. DCPS shall coordinate scheduling the meeting, and any meeting in which Petitioner's placement is discussed or determined, through Petitioner's counsel, Fatmata Barrie, Esquire. The MDT shall review all current evaluations, develop an IEP, and discuss placement alternatives.

**IT IS FURTHER ORDERED,** that DCPS shall afford Petitioner's parent an opportunity to participate in any meeting in which Petitioner's placement is discussed or determined. The DCPS placement representative shall advise Petitioner's parent of the advantages and disadvantages for Petitioner with respect to each school that is discussed, including any schools proposed by the parent. DCPS shall provide Petitioner's parent in an explanation for the placement DCPS proposes, and the reasons for the proposal shall be provided in the Meeting Notes. DCPS shall issue a Prior Notice within seven days if Petitioner is placed in a public facility or within 30 days if Petitioner is placed in a private facility.

---

[10] See 34 C.F.R. Section 300.513(a)(3).

**IT IS FURTHER ORDERED,** that in the event of DCPS' failure to comply with the terms of this Order, Petitioner's counsel will contact the appropriate DCPS Placement Specialist and the DCPS Office of Mediation & Compliance to attempt to bring the case into compliance prior to filing a hearing request alleging DCPS' failure to comply.[11]

**IT IS FURTHER ORDERED,** that any delay in meeting any of the deadlines in this Order because of Petitioner's absence or failure to respond promptly to scheduling requests, or that of Petitioner's representatives, will extend the deadlines by the number of days attributable to Petitioner or Petitioner's representatives. DCPS shall document with affidavits and proofs of service for any delays caused by Petitioner or Petitioner's representatives.

**IT IS FURTHER ORDERED,** that this Order is effective immediately.

### Notice of Right to Appeal Hearing Officer's Decision and Order

This is the final administrative decision in this matter. Any party aggrieved by the findings and/or decision may bring a civil action in any state court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy within ninety (90) days of the entry of the Hearing Officer's Decision, in accordance with 20 U.S.C. Section 1415(i)(2)(B).

_____
Terry Michael Banks
Hearing Officer


Date: September 21, 2007          Issued: _____

Copies to:

Fatmata Barrie, Esquire
1003 K Street, N.W.; Suite 500
Washington, D.C. 20001
(202) 626-0040; Fax: (202) 626-0048

Aaron E. Price, Esquire
Office of the General Counsel, DCPS
825 North Capitol Street, N.E.; 9th Floor
Washington, D.C. 20002

---

[11] If DCPS fails to provide copies of the OT and S/L evaluations or coordinate scheduling the MDT meeting by dates that would make compliance with this Order feasible, Petitioner's counsel shall initiate telephone calls and electronic correspondence to attempt to effect compliance within the timelines set out herein.

# ATTENDANCE SHEET

STUDENT'S NAME: ███████ ███████

SCHOOL OF ATTENDANCE: _Options P.C.S._

D.O.B: ███/96

---

HEARING DATE: 9/12/07    ROOM: 6A    TIME: 2:22 A.M./P.M.

| PARTICIPANT NAME: | ON BEHALF OF DCPS OR STUDENT: | TITLE: |
|---|---|---|
| Aaron E. Price, Sr., Esq. | DCPI | ADA |
| Tamala Barrie | Student | Atty. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## PLEASE CHECK ONE OF THE FOLLOWING BOXES

Hearing Held/Concluded __X__    Withdrawn _____    Settlement _____    Continued _____

Other: _____

_____

_____

_Terry Banks_

**Impartial Hearing Officer (PLEASE SIGN)**

Revised 07/25/07   10

# District of Columbia Public Schools
## State Enforcement and Investigation Division
**Terry Michael Banks, Due Process Hearing Officer**
825 North Capitol Street, N.E.; Room 8076
Washington, D.C. 20002
(571) 437-7381
Facsimile: (202) 442-5556

## Confidential

| | |
|---|---|
| M▬▬▬ M▬▬▬, STUDENT ) | Hearing Dates: February 9, 2007 |
| ) | April 9, 2007 |
| Date of Birth: ▬▬▬, 1996 ) | |
| ) | Complaint Filed: December 13, 2006 |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | |
| THE DISTRICT OF COLUMBIA ) | |
| PUBLIC SCHOOLS ) | |
| ) | Held at: 825 North Capitol Street, N.E. |
| Respondent. ) | 8th Floor |
| ) | Washington, D.C. 20002 |
| Student Attending: ) | |
| Thomas Elementary School ) | Interim Order: March 16, 2007 |

## HEARING OFFICER'S DECISION

| | |
|---|---|
| **Parents:** | Mr. Sharon Matthews, Mother |
| | 3685A Jay Street, N.E.; #201 |
| | Washington, D.C. 20019 |
| | |
| **Counsel for Petitioner:** | Fatmata Barrie, Esquire |
| | 1003 K Street, N.W. |
| | Suite 500 |
| | Washington, D.C. 20001 |
| | (202) 626-0040; Fax: (202) 626-0048 |
| | |
| **Counsel for DCPS:** | Daniel McCall, Esquire |
| | Office of the General Counsel, DCPS |
| | 825 North Capitol Street, N.E.; 9th Floor |
| | Washington, D.C. 20002 |

An index of names is attached hereto for the benefit of the parties. The index will permit the parties to identify specific witnesses and other relevant persons. The index is designed to be detached before release of this Decision as a public record.

## INDEX OF NAMES

| Child | M█████ M████████ |
|---|---|
| Child's Parent(s) (specific relationship) | Sharon Matthews, Mother |
| Child/Parent's Representative | Fatmata Barrie, Esquire |
| School System's Representative | Daniel McCall, Esquire |
| Special Education Coordinator | Darcy Parris, Thomas E.S. |

**Jurisdiction**

This hearing was conducted in accordance with the rights established under the Individuals With Disabilities Education Improvement Act of 2004 ("IDEIA"), 20 U.S.C. Sections 1400 et seq., Title 34 of the Code of Federal Regulations, Part 300; Title V of the District of Columbia ("District" or "D.C.") Municipal Regulations ("DCMR"), re-promulgated on February 19, 2003; and Title 38 of the D.C. Code, Subtitle VII, Chapter 25.

**Introduction**

Petitioner is an eleven year-old student attending Thomas Elementary School ("Thomas"). On December 13, 2006, Petitioner filed a Due Process Complaint Notice ("*Complaint*") alleging that the District of Columbia Public Schools ("DCPS") had failed to (1) comply with the terms of a Hearing Officer's Decision ("HOD"), (2) develop an appropriate Individualized Education Program ("IEP"), (3) provide necessary services, (4) provide an appropriate placement, (5) evaluate Petitioner in all areas of suspected disability, (6) allow Petitioner's parent the opportunity to participate in a placement meeting, (7) provide Petitioner's parent notice of her due process rights, and (8) provide compensatory education services. The due process hearing was convened on February 9, 2007. DCPS objected to any documents in Petitioner's Five-day Disclosure that preceded an HOD issued on July 3, 2006. The hearing officer deferred judgment on all documents until they were offered into evidence.

DCPS then moved to dismiss the *Complaint* to the extent it is grounded on the violation of a previous HOD, having filed a written motion on the day of the hearing. DCPS argued that the hearing officer lacks jurisdiction to enforce a previous HOD, and DCPS' written motion cited authorities from several jurisdictions other than the District of Columbia. Petitioner opposed the motion as untimely. The hearing officer deferred ruling on the motion because it was untimely filed.[1] The hearing officer left the record open until the close of business on February 16, 2007 for Petitioner's counsel to file a response to DCPS' motion.[2]

DCPS then moved for a continuance for Petitioner's failure to attend the Resolution Session meeting. After taking testimony from the Special Education Coordinator at Petitioner's school, the hearing officer was persuaded that Petitioner failed to participate in the Resolution Session. Unless both parties agree in writing to waive it or to use mediation,[3] IDEIA requires a Resolution Session Meeting within fifteen (15) days of the filing of the Complaint with the parents and relevant members of the IEP who have specific knowledge of the facts identified in the Complaint. The purpose of the meeting is to discuss the allegations in the Complaint and to allow the local educational agency the

---

[1] The DCPS Standard Operating Procedures ("SOP") require pre-hearing motions to be filed no later than five business days before the hearing. SOP, §401(C)(4).

[2] Petitioner's counsel filed a Response to DCPS' *Motion to Dismiss* on February 16, 2007.

[3] 20 U.S.C. §1415(f)(1)(B)(i)(IV).

opportunity to resolve the complaint.[4] The hearing officer concluded that good cause existed for a continuance to afford the parties an opportunity to conclude a Resolution Session meeting. The hearing was rescheduled to March 16, 2007. On March 15, 2007, Petitioner's counsel requested a continuance, because the Resolution Session meeting had not been conducted. The hearing officer again found that good cause existed for a continuance. The due process proceeding was reconvened on April 9, 2007. The parties' Five-Day Disclosure Notices were admitted into evidence at the inception of the hearing except Petitioner's Exhibit Nos. 8, 10, and 11, as to which the hearing officer deferred a ruling until offered into evidence.

**Witnesses for Petitioner**

    Petitioner's Mother

**Witnesses for DCPS**

    Darcy Parris, Special Education Coordinator, Thomas E.S.

**Findings of Fact**

    1. Petitioner is an eleven year-old student attending Thomas.[5]

    2. DCPS developed an IEP for Petitioner on January 23, 2006. Petitioner was classified as Learning Disabled ("LD"). The MDT prescribed ten hours per week of specialized instruction.[6]

    3. At the end of the 2005-2006 school year, Petitioner's grades were at Basic or Proficient in every subject.[7]

    4. On June 30, 2006, an HOD was issued in which Hearing Officer Coles B. Ruff concluded that DCPS had not denied Petitioner a free appropriate public education as to any issue alleged in the Complaint. Nevertheless, the hearing officer ordered DCPS to convene a Multidisciplinary Team ("MDT") within forty-five days "to review the student's IEP and consider input (from the parent, her educational advocate and other persons the parent wishes to participate) regarding the student's academic goals and short term objectives."[8]

---

[4] 20 U.S.C. §1415(f)(1)(B)(i); 34 C.F.R. §300.510(a).
[5] *Complaint* at 1.
[6] Petitioner's Exhibit ("P.Exh.") No. 2 at 1.
[7] P.Exh. No. 17.
[8] P.Exh. No. 19 at 6.

5. On August 8, 2006, Petitioner's educational advocate, Annie Pressley, accepted an MDT meeting date proposed by DCPS for August 23, 2006.[9] DCPS convened the MDT meeting as scheduled. At that meeting, Petitioner's mother agreed to have DCPS implement Petitioner's January 2006 IEP as written. Petitioner's mother was represented at the MDT meeting by Ms. Pressley.[10]

6. Petitioner was suspended on October 30, 2006 for two days for fighting.[11] Petitioner has not been involved in any other disruptive incidents at school.[12]

7. On September 28, 2006, Children's National Medical Center ("CNMC") completed a Psychoeducational Evaluation of Petitioner. The psychologist's findings and recommendations, *inter alia*, included the following:

> Results of the cognitive assessment indicated overall Low Average ability (fourteenth percentile) with Average perceptual reasoning ability (thirteenth percentile) and processing speed (twenty-seventh percentile), and Low Average working memory (eighteenth percentile) and verbal comprehension (thirteenth percentile), which was commensurate with her performance on the WISC-IV Perceptual Reasoning Index. Assessment of her oral language skills revealed Average immediate story memory with Below Average delayed story memory... Her phonological processing was in the Poor to Very Poor range for manipulating sounds and blending words. Given [Petitioner's] Low Average Verbal Comprehension Index score and impaired performance on phonological processing measures, a speech and language evaluation is warranted. She demonstrated Above Average visual perceptual ability with Below Average motor coordination and Low visual-motor integration, an occupational therapy evaluation is warranted.
>
> Results of the achievement testing indicated academic skills which varied from Low to Average. [Petitioner] demonstrated Low sight word identification and word attack skills in an untimed format. Her word reading efficiency was equally deficient while a supplemental test of phonetic and word analysis skills indicated the need for systematic instruction across a range of decoding skills. [Petitioner's] reading fluency fell in the Low Average range as did her literal reading comprehension when measured at the sentence level using a fill-in-the-blank format... Her poor phonological processing is interfering with the development of her basic reading and spelling skills. While her basic calculation skills fall within age expectations, [Petitioner] is having difficulty with applied problem solving. A speech-language evaluation would help clarify whether her weak reading comprehension, written expression, and math problem-solving are a function of her difficulties comprehending language or result from her poor reading skills.

---

[9] P.Exh. No. 16.
[10] P.Exh. No. 1, Meeting Notes.
[11] P.Exh. No. 20.
[12] Testimony of Ms. Parris.

5

Results of norm-based rating scales completed by [Petitioner's] teacher are consistent with a diagnosis of Attention-Deficit/Hyperactivity Disorder – Inattentive Type. However, given [Petitioner's] significant academic deficiencies, it is not clear if her symptoms reflect a biologically-based disorder of attention or have developed in response to her struggles in learning... [Petitioner] would benefit from individual therapy to assist her in understanding her learning difficulties and to help her develop more effective coping skills.

RECOMMENDATIONS

... [Petitioner] would benefit from a small, supportive, structured class environment with a small student-teacher ratio that is designed to meet the needs of students with specific learning disabilities in reading and written language. She requires a high degree of structure, support, and positive feedback in order to be successful. A separate program should also provide the related services (e.g., speech and language therapy, occupational therapy, and counseling) that may be necessary for [Petitioner] to derive educational benefit.[13]

8. There is no documentation in the record that Petitioner provided DCPS a copy of the CNMC Psychoeducational Evaluation.

9. DCPS convened an MDT meeting on December 6, 2006. The MDT classified Petitioner as Learning Disabled and prescribed fifteen hours of specialized instruction.[14] Petitioner's special education teacher, Ms. Orejimi, reported as follows:

Teacher is using 4th grade reading material with modifications. She notes improvement in reading skills. [Petitioner] requires prompting and reminders for homework and materials. In reading, [Petitioner] needs help with spelling, which is practiced in class with dictionary skills, which is phonemic strategies. Reading fluency, [Petitioner] requires prompting, she requires positive praise, but she does not feel comfortable and makes an attempt. Writing skills, [Petitioner] requires reminders for capitalization for starting sentences. Oral language, 8 years 11 months 3 grade 5 months. Reading 8 years 3 months (grade 2 – 5 months). Broad reading 3rd grade 3 months. Special education teacher... notes growth in skills since last year and reviewed current academic goals and objectives.[15]

10.    Petitioner's parent and advocate expressed disagreement with the December 6, 2006 IEP in a number of respects: failure to provide tutoring services, failure to provide extended year services, and failure to provide compensatory education services.[16]

---

[13] P.Exh. No. 23 at 10-11.
[14] P.Exh. No. 9 at 1.
[15] Id., Meeting Notes at 1-2.
[16] Id., Meeting Notes at 2.

**Conclusion of Law**

1. In support of its *Motion to Dismiss*, DCPS cited 34 C.F.R. Section 300.507(a)(1) for the proposition that hearing officers lack the authority to enforce previously issued HODs. 34 C.F.R. Section 300.507(a)(1) provides that "A parent of a public agency may file a due process complaint on any of the matters described in 300.503(a)(1) and (2)." 34 C.F.R. Section 300.503(a)(1) and (2) provide as follows:

> (a) Notice. Written notice that meets the requirements of paragraph (b) of this section must be given to the parents of a child with a disability a reasonable time before the public agency--
>
> (1) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or
>
> (2) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.

Thus, DCPS contends that the Complaint must relate to the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education ("FAPE") to the child.

DCPS also cited *Olson v. Robbindale Area Schools*,[17] *Cosentino v. Lexington School Committee*,[18] and *Wyner v. Manhattan Beach Unified School District*.[19] In *Olson*, parents who had prevailed at the administrative level filed suit in federal court to enforce an HOD when the school district refused to comply with the order. The court held that "While 'the IDEA permits *aggrieved* parties to seek review of an administrative hearing panel's decision...' it 'does not contemplate an action to enforce an administrative decision... The Olsons may not, therefore, enforce the hearing officer's decision through the IDEA."[20] The court held that plaintiffs' only federal court remedy was a suit under 42 U.S.C. Section 1983.[21] The court in Cosentino reached a similar result.[22] The plaintiffs in Cosentino sought injunctive relief in federal court to enforce an HOD.

In *Wyner*, a hearing officer issued an HOD requiring the school district to comply with the terms of a settlement agreement. When the school district failed to comply with the HOD, the parents initiated another due process proceeding to enforce the first HOD. The hearing officer determined that under California law, he did not have jurisdiction, because the first HOD was "the final administrative determination binding on all

---

[17] 2004 U.S. Dist. LEXIS 9858, Civ. Action No. 04-2707 (D.Minn. May 28, 2004).
[18] 762 F.Supp. 416 (D.Mass. 1991).
[19] 223 F.3d 1026 (9th Cir. 2000).
[20] *Olson* at 6-7.
[21] *Id.* at 8.
[22] 762 F.Supp. at 418.

parties."[23] The hearing officer also noted that California law provided an alternative remedy for enforcing HODs; a compliance proceeding could be initiated before the Compliance Office of the California Department of Education.[24]

Under DCPS regulations, "A parent of a LEA child or the LEA has the right to initiate a hearing, when there is a dispute about the eligibility, identification, evaluation, educational placement, or the provision of FAPE to a child with a disability, in accordance with 20 U.S.C. § 1415 (f)."[25] 20 U.S.C. § 1415 (f) refers back to 20 U.S.C. § 1415 (b)(6), which requires school districts to provide "An opportunity for any party to present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child…" Thus, a party may seek compliance of a previous HOD in the District by filing a new IDEIA complaint only if DCPS' non-compliance constitutes a denial of FAPE.

On July 26, 2006, DCPS entered into a Consent Decree in *Blackman v. District of Columbia*.[26] The court approved the Consent Decree on August 24, 2006. In that Decree, DCPS agreed to the definition of a subclass, known as the "Jones class," that includes

> All children, *now* [as of January 1, 1995] *and in the future*, who are entitled to have DCPS provide them with a free appropriate public education (FAPE) and who have been denied same because DCPS either (a) has failed to fully and timely implement the determinations of hearing officers, or (b) failed to fully and timely implement agreements concerning a child's identification, evaluation, educational placement, or provisions of FAPE that DCPS has negotiated with child's parent or education advocate.[27]

Thus, DCPS has agreed that the failure timely to implement an HOD constitutes a denial of FAPE, and that any student, "now and in the future," who's HOD has not been timely implemented, is a member of the class entitled to relief. DCPS also agreed that its failure timely to comply with an HOD creates a rebuttable presumption of harm to the affected petitioner:

> This Consent Decree establishes a rebuttable presumption of harm for students denied timely hearings or HOD and for students who failed to receive timely implementation of HODs and SAs. Within (15) days of Final Approval of this Consent Decree, Defendants will revise their policies and the due process complaint request form to incorporate this rebuttable presumption of harm.[28]

---

[21] 223 F.3d at 1030.
[24] *Id.*
[25] 5 C.D.M.R. §3029.1.
[26] Civil Action No. 97-1629 (D.D.C. Aug. 24, 2006).
[27] Decree at 10, emphasis added.
[28] Decree, ¶ 74 at 39.

8

In the cased cited by DCPS in support of its motion, all of which are from other jurisdictions, the courts implicitly concluded that the failure to comply with an HOD did not constitute a denial of FAPE.[29] In this jurisdiction, however, the *Blackman* Consent Decree is controlling, and the Decree explicitly provides that noncompliance with an HOD constitutes a denial of FAPE. Therefore, in the event DCPS fails to comply with an HOD, the affected petitioner may seek compliance of the HOD in an administrative due process proceeding pursuant to 5 D.C.M.R. 3029.1.

2. The June 30, 2006 HOD required DCPS to convene an MDT meeting within 45 days. On August 8, 2006, Petitioner's educational advocate accepted a meeting date of August 23, 2006. DCPS convened the meeting and Petitioner's mother concurred with the decisions made at the meeting. Petitioner has failed to meet her burden of proving that DCPS violated the June 30, 2006 HOD.

3. Petitioner's mother offered no testimony that DCPS failed to notify her of her due process rights. Thus, Petitioner failed to meet her burden of proof as to this issue.

4. Petitioner's mother testified that DCPS permitted full participation at MDT meetings and that she was accompanied by an educational advocate at the meetings. Thus, Petitioner failed to meet her burden of proof as to this issue.

5. Petitioner's mother was unable to identify any prescribed services that Petitioner has not received. Ms. Parris testified that Petitioner's special education teacher has a perfect attendance record. The hearing officer concludes that Petitioner has failed to meet her burden as to DCPS' alleged failure to provide necessary or prescribed services.

6. Petitioner's mother was represented at the August 23, 2006 MDT by an educational advocate and concurred with the MDT's decision to continue to implement the January 23, 2006 IEP as written. Petitioner offered no evidence to undermine the validity of the parent's decision. Therefore, Petitioner has not shown that the January 2006 IEP is inappropriate.

Similarly, Petitioner's mother offered no testimony as to any deficiency in the December 6, 2006 IEP. She admitted that she did not propose any modifications to the IEP that were rejected by the MDT. Petitioner's parent and advocate expressed disagreement with the December 6, 2006 IEP in a number of respects: failure to provide tutoring services, failure to provide extended year services, and failure to provide compensatory education services. However, Petitioner presented no persuasive testimony at the hearing that provided any justification for the denied services. A review of the

---

[29] *Olson* and *Cosentino* are somewhat distinguishable, because each of those cases involved an attempt to enforce an HOD in federal court rather than before a hearing officer. *Wyner* did involve an effort to enforce an HOD before a hearing officer. However, that case is also distinguishable, because (1) there is no statutory language in the District, similar to that California, establishing that an HOD is "the final administrative determination binding on all parties," and (2) there is no statutory HOD compliance mechanism in the District similar to that in California. However, in all of the cases cited by DCPS, and in the cases relied on therein, the courts consistently reached the implicit conclusion that noncompliance with an HOD did not constitute a denial of FAPE.

9

19

educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student."[31]

Thus, there is no inherent "right" to compensatory education services under IDEIA. Such services are awarded only upon a finding of an IDEIA violation. Petitioner has failed to meet her burden of proving an entitlement to compensatory education services.

10.    The hearing officer has concluded that DCPS has prevailed as to each allegation in the *Complaint*. However, the CNMC evaluation recommends that Petitioner receive occupational therapy and speech and language evaluations as well as a full-time special education placement in a small-class, structured environment. The hearing officer did not find that DCPS was derelict in failing to provide these services, because Petitioner made no showing that DCPS was aware of the evaluation at the time of the December 6, 2006 MDT meeting. The hearing officer also excluded the testimony and written report of Dr. Kara Covington, a psychologist. Dr. Covington's report was prepared in March 2007, three months after the December 2006 MDT meeting, and over one month after the original scheduled hearing date.

In the past, this hearing officer has ordered DCPS to take certain actions in the best interest of a petitioner even though DCPS had not been shown to have violated IDEIA. In fact, this proceeding arose from an HOD in which Hearing Officer Ruff ordered DCPS to convene an MDT meeting despite the absence of an IDIEA violation. However, in the recent case of *T.S. v. District of Columbia*,[32] the Hearing Officer Ruff had ordered DCPS to fund an independent evaluation even though the hearing officer had concluded that DCPS had not violated any statutory or procedural obligations. The court determined that the petitioner was the prevailing party, because the hearing officer had ultimately granted the relief requested in the Complaint.

This hearing officer believes that Petitioner should receive the evaluations recommended by CNMC, and that an MDT meeting should be reconvened thereafter to consider the findings and recommendations contained in the CNMC evaluation and Dr. Covington's evaluation. To avoid the result reached in *T.S.*, and despite the apparent authority granted in 34 C.F.R. Section 300.513(a)(3), the hearing officer will not order DCPS to take these steps. The hearing officer will, however, order the parties to reconvene an MDT meeting to determine the need for further evaluations. [33]

---

[31] *Reid v. District of Columbia*, 401 F.3d 516, 523 (D.C. 2005) (*citations omitted*).
[32] Civil Action No. 05-00861 (D.D.C. March 27, 2007).
[33] Petitioner did not request occupational therapy and speech and language evaluations in the *Complaint*, nor did she request placement in a small-class, highly structured environment. Moreover, Petitioner offered no proposed alternative placement that would have offered such a setting. Thus, the hearing officer's ordering an MDT meeting to develop an evaluation plan both departs significantly from the relief requested by Petitioner and falls far short of the relief recommended by CNMC.

11

educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student."[31]

Thus, there is no inherent "right" to compensatory education services under IDEIA. Such services are awarded only upon a finding of an IDEIA violation. Petitioner has failed to meet her burden of proving an entitlement to compensatory education services.

10.    The hearing officer has concluded that DCPS has prevailed as to each allegation in the *Complaint*. However, the CNMC evaluation recommends that Petitioner receive occupational therapy and speech and language evaluations as well as a full-time special education placement in a small-class, structured environment. The hearing officer did not find that DCPS was derelict in failing to provide these services, because Petitioner made no showing that DCPS was aware of the evaluation at the time of the December 6, 2006 MDT meeting. The hearing officer also excluded the testimony and written report of Dr. Kara Covington, a psychologist. Dr. Covington's report was prepared in March 2007, three months after the December 2006 MDT meeting, and over one month after the original scheduled hearing date.

In the past, this hearing officer has ordered DCPS to take certain actions in the best interest of a petitioner even though DCPS had not been shown to have violated IDEIA. In fact, this proceeding arose from an HOD in which Hearing Officer Ruff ordered DCPS to convene an MDT meeting despite the absence of an IDIEA violation. However, in the recent case of *T.S.* v. *District of Columbia*,[32] the Hearing Officer Ruff had ordered DCPS to fund an independent evaluation even though the hearing officer had concluded that DCPS had not violated any statutory or procedural obligations. The court determined that the petitioner was the prevailing party, because the hearing officer had ultimately granted the relief requested in the Complaint.

This hearing officer believes that Petitioner should receive the evaluations recommended by CNMC, and that an MDT meeting should be reconvened thereafter to consider the findings and recommendations contained in the CNMC evaluation and Dr. Covington's evaluation. To avoid the result reached in *T.S.*, and despite the apparent authority granted in 34 C.F.R. Section 300.513(a)(3), the hearing officer will not order DCPS to take these steps. The hearing officer will, however, order the parties to reconvene an MDT meeting to determine the need for further evaluations.[33]

---

[31] *Reid v. District of Columbia*, 401 F.3d 516, 523 (D.C. 2005) (*citations omitted*).
[32] Civil Action No. 05-00861 (D.D.C. March 27, 2007).
[33] Petitioner did not request occupational therapy and speech and language evaluations in the *Complaint*, nor did she request placement in a small-class, highly structured environment. Moreover, Petitioner offered no proposed alternative placement that would have offered such a setting. Thus, the hearing officer's ordering an MDT meeting to develop an evaluation plan both departs significantly from the relief requested by Petitioner and falls far short of the relief recommended by CNMC.

## ORDER

Upon consideration of Petitioner's request for a due process hearing, the parties' Five Day Disclosure Notices, the testimony presented at the hearing, and the representations of the parties' counsel at the hearing, this 26th day of April 2007, it is hereby

**ORDERED**, that DCPS' *Motion to Dismiss* is **DENIED.**

**IT IS FURTHER ORDERED**, that the *Complaint* is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED**, that on or before May 18, 2007, DCPS shall convene an MDT meeting to develop a Student Evaluation Plan. DCPS shall coordinate scheduling the MDT meeting with Petitioner's counsel, Fatmata Barrie.

**IT IS FURTHER ORDERED**, that in the event of DCPS' failure to comply with the terms of this Order, Petitioner's counsel will contact the Special Education Coordinator at Thomas and the DCPS Office of Mediation & Compliance to attempt to bring the case into compliance prior to filing a hearing request alleging DCPS' failure to comply.[34]

**IT IS FURTHER ORDERED**, that any delay in meeting any of the deadlines in this Order because of Petitioner's absence or failure to respond promptly to scheduling requests, or that of Petitioner's representatives, will extend the deadlines by the number of days attributable to Petitioner or Petitioner's representatives. DCPS shall document with affidavits and proofs of service for any delays caused by Petitioner or Petitioner's representatives.

**IT IS FURTHER ORDERED**, that this Order is effective immediately.

*Terry Michael Banks*
Terry Michael Banks
Hearing Officer

Date: April 26, 2007

Issued: _____

---

[34] If DCPS fails to contact Petitioner's counsel to coordinate scheduling the MDT meeting by a date that would make compliance with this Order feasible, Petitioner's counsel shall initiate telephone calls and electronic correspondence to attempt to effect compliance within the timelines set out herein.

12

22

Copies to:

Fatmata Barrie, Esquire
1003 K Street, N.W.; Suite 500
Washington, D.C. 20001
(202) 626-0040; Fax: (202) 626-0048

Daniel McCall, Esquire
Office of the General Counsel, DCPS
825 North Capitol Street, N.E.; 9th Floor
Washington, D.C. 20002

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**

 

# Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 1150 5th St, NE, 1st Floor, Washington, DC 20003; fax number: (202) 698-3825.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A. INFORMATION ABOUT THE STUDENT:

Student Name  M▬▬▬ M▬▬▬                           Birth Date: ▬▬/96

Address: 3685A JAY ST, NE, #201, WASHINGTON, DC 20019

Home School:  UNKNOWN
Present School of Attendance:  THOMAS ES   *Options PSC*

Is this a charter school?        NO     (if yes, you must also provide a copy of this notice to the charter
                                         school principal or director)

Parent/Guardian of the Student:  MS. SHARON MATTHEWS

Address (if different from the student's above): _____

1

Phone/Contact Number:   (202) 396-5428                Fax Number: _____

**B.**   <u>**Individual Making the Complaint/Request for Due Process Hearing:**</u>

Name:   MS. SHARON MATTHEWS _____

Complete Address:  3685A JAY ST, NE, #201, WASHINGTON, DC 20019 _____

Phone:  (h) (202) 396-5428 _____   (w) _____   (Fax) _____   (cell) _____

Relationship to the Student:

| | | | | | |
|---|---|---|---|---|---|
| X | Parent | ☐ | Legal Guardian | ☐ | Parent Surrogate |
| ☐ | Self/Student | ☐ | Local Education Agency (LEA) | ☐ | Parent Advocate |
| ☐ | Court Appointed Educational Advocate | | | | |

**C.**   <u>**Legal Representative/Attorney (if applicable):**</u>

Name:   Fatmata Barrie, Esq.  (Law Offices, Christopher N. Anwah, PLLC) ____

Address:  1003 K St. NW #565 Washington, DC  20020 _____

Phone: (w)  202-626-0040 _____   (Fax) 202-626-0048 _____   (e-mail) _____

Will attorney / legal representative attend the resolution session?   **X** Yes          ☐ No

**D.**   <u>**Complaint Made Against (check all that apply):**</u>

**X** DCPS school ( name of the school if different from page one) _____
☐ Charter school (name of the charter school if different from page one) _____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**E.**   <u>**Resolution Session Meeting Between Parent and LEA:**</u>

I understand that it is my right to have a resolution meeting to resolve this complaint.  I also understand that I may voluntarily waive this right if I choose.  (Note:  All parties must agree to waive the resolution meeting to avoid having this meeting.)

☐ I wish to waive the Resolution Session Meeting

**F.**   <u>**Mediation Process:**</u>

IDEIA requires that any time a party requests a due process hearing mediation should be offered at no cost to the parent.  Both parties can request mediation as an alternative to the Resolution Session Meeting or as an alternative to a Due Process Hearing.  Please check all that apply:

☐      I am requesting mediation as an alternative to the resolution session meeting.

2

SEID DPCN  Rev'd 7/12/05                                    Mellonee Matthews 04/11/96

☐    I am requesting mediation and a due process hearing.

☐    I am requesting mediation **only** at this time.

## G.    Facts and Reasons for the Complaint:

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.    What is the nature of the problem, including the facts relating to the problem that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

A.    DCPS has failed to provide an appropriate placement for the 2005-06SY and the 2006-07SY at Thomas ES. M████████ September 2006 comprehensive psycho-educational evaluation recommended a small structured environment with low student to teacher ratio. However, Thomas ES does not provide this environment or placement. Further, M████████ academics have not improved and she is functioning below her age and grade level. Lastly, M████████ has been suspended from school. Therefore, DCPS has denied her FAPE.

B.    DCPS has failed to develop an appropriate IEP for the 2005-06SY and the 2006-07SY at Thomas ES. M████████ 01/24/05 IEP, 01/23/06 IEP, and 12/06/06 IEP have failed to improve her academics, and provide services for her behavior. In fact, she still functions below her age and grade level. Further, the team convened on 06/05/07 and reviewed her September 2006 comprehensive psycho-educational. The evaluation recommended counseling, O/T, and S/L related services which DCPS has failed to provide. Further, it recommended a small structured classroom LRE, but DCPS has failed to accommodate. Further, DCPS failed to complete a clinical, FBA, or psychiatric evaluations despite the child's negative behavior and suspension. Therefore, DCPS has denied her FAPE.

C.    DCPS has failed to evaluate M████████ in all areas of suspected disability because they did not complete the following evaluations, which are a comprehensive O/T, S/L, clinical, FBA, and psychiatric. At the 12/06/06 IEP meeting, M████████ advocate requested a clinical and FBA to diagnose her negative behavior, which DCPS refused. At the 06/05/07 MDT meeting, the advocate requested a psychiatric for M████████ ADHD. M████████ was diagnosed with ADHD in her September 2006 comprehensive psycho-educational. DCPS refused and recommended the parent get her own psychiatric testing done from M████████ personal physician. DCPS' egregious conduct has left M████████ without the evaluations she needs, and has denied her FAPE.

D.    DCPS has failed to provide the appropriate educational and related services and all related services for the 2005-06SY and the 2006-07SY at Thomas ES. M████████ speech and language skills affect her academics and DCPS has failed to ever provide any services to improve them. Further, her motor visual skills are below average and have impacted her academics. Above all, M████████ requires special education services, conducive to her disability and needs, i.e. specialized instruction, S/L, O/T, and counseling for her behavior. Therefore, DCPS has denied her FAPE.

E.    DCPS has failed to provide compensatory education for the past and present denial of FAPE for the 2005-06SY and the 2006-07SY at Thomas ES for failure to provide an appropriate placement, IEPs, evaluations, educational and related services, all related services, and special education services in the form of independent one-on-one tutoring, counseling, and a laptop computer.

2.    To the extent known to you at this time, how can this problem be resolved?

A.    DCPS to fund placement of the parent's choice including but not limited too High Road, Rock Creek Academy, or Accotink Academy with transportation.

B.    DCPS fund independent evaluations which are a comprehensive O/T, S/L, clinical, FBA, and psychiatric, and any evaluations recommended by them.

3

C. DCPS to convene an MDT/IEP meeting to develop an appropriate IEP for M_____. If DCPS fails to attend, the MDT/IEP team can move forward without them.

D. DCPS to provide educational and related services, and all related services and special education services conducive to her disabilities and needs, i.e. specialized instruction, S/L, O/T, and counseling for her behavior.

E. DCPS fund compensatory education for the past and present denial of FAPE for the 2005-06SY and the 2006-07SY at Thomas ES for failure to provide an appropriate placement, IEPs, evaluations, educational and related services, all related services, and special education services in the form of independent one-on-one tutoring, counseling, and a laptop computer, or in the alternative, the parent reserves the right for it.

F. DCPS to pay reasonable attorney fees.

3.    Issues presented:

A. Whether DCPS denied M_____ Free Appropriate Public Education (FAPE) when they failed to provide an appropriate placement for the 2005-06SY and the 2006-07SY at Thomas ES because she has not improved academically?

B. Whether DCPS denied M_____ FAPE when they failed to provide appropriate an IEP for the 2005-06SY and the 2006-07SY at Thomas ES because she has not improved academically, i.e. 01/24/05 IEP, 01/23/06 IEP, and 12/06/06 IEP?

C. Whether DCPS denied M_____ FAPE when they failed to provide her with appropriate educational and related services, and all her related services and special education services for the 2005-06SY and the 2006-07SY at Thomas ES, i.e. specialized instruction, S/L, O/T, and counseling for her behavior?

D. Whether DCPS denied M_____ FAPE when they failed to evaluate her in all areas of suspected disability when they did not complete a comprehensive O/T, S/L, clinical, FBA, and psychiatric?.

E. Whether DCPS denied M_____ FAPE when they failed to fund compensatory education for the past and present denial of FAPE for the 2005-06SY and the 2006-07SY at Thomas ES for failure to provide an appropriate placement, IEPs, evaluations, educational and related services, all related services, and special education services in the form of independent one-on-one tutoring, counseling, and a laptop computer?

H.    **Estimated amount of time needed for the hearing:**                    3 Hours

Note: In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time and will allocate two hours to conduct the hearing. Please indicate if you believe more than two hours will be needed.

I.    **Accommodations and Assistance Needed:**

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type) _____
- Special Communication (please describe the type) _____
- Special Accommodations for Disability (please be specific) _____
- Other _____

4

Mellonee Matthews 04/11/96

**J.**    **Waiver of Procedural Safeguards:**

☐ I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**K.**    **Parent Signature and Affirmation:**

I affirm that the information provided on this form is true and correct.

_____    _____
Signature of Parent or Guardian            Date

**L.**    **Signature of Attorney/ Legal Representative:**

07/05/07
_____    _____
Legal Representative/ Advocate            Date

**M.**    **Signature of LEA Representative (if hearing requested by LEA):**

_____    _____
Representative of LEA            Date

Mail, fax or deliver this complaint notice to:
State Enforcement and Investigation Division
For Special Education Programs (SEID)
Student Hearing Office (SHO)
1150 5th Street, SE, 1st Floor
Washington, DC 20003
Fax: (202) 698-3825

5

Mellonee Matthews 04/11/96

SEID DPCN Rev'd. 7/12/05

# LAW OFFICES, CHRISTOPHER N. ANWAH, PLLC

Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
   (DC, MD, NJ)
Fatmata Barrie, Esq.
   (DC, FL)
Georgina A. Oladokun, Esq.
   (MD)
Allen Mohaber, Esq.
   (MD)
Matthew S. Mixon, Esq.
   (DC, MD)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

## FACSIMILE COVER LETTER

DATE: 07/05/07

TO: SHO

COMPANY: SHO

FAX NUMBER: (202) 698-3825

FROM: Allen Mohaber, Esq

RE: M████████ M█████████ DUE PROCESS COMPLAINT NOTICE (DOB: ███/96)

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET: _____6_____

MESSAGE:
If there is any problem with this transmission, please call as soon as possible at (202) 626-0040

### ***CONFIDENTIALITY NOTICE***

The pages that accompany this facsimile transmission contain information from CHRISTOPHER N. ANWAH, PLLC, which is confidential or privileged, or both. The information is needed to be for the use of the individual or entity named on this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately at 202-626-0040 so that we can arrange for the retrieval of the original documents at no cost to you.

# STATE EDUCATION AGENCY
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| M██████, M.          Petitioner | ) | |
| | ) | HEARING OFFICER |
| Vs. | ) | |
| | ) | |
| PUBLIC | ) | |
| Thomas ES | | |
| | ) | DISTRICT OF COLUMBIA |
| | | |
| Respondent | ) | PUBLIC SCHOOLS |

## SCHEDULING MEMORANDUM

1. A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint within 15 calendar days of receiving notice of the parents' complaint. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **The Student Hearing Office does not schedule or participate in resolution meetings**.

2. The complaint notice was filed on **July 5, 2007**

3. The deadline for the resolution meeting is **July 20, 2007** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

### RESPONSE TO THE COMPLAINT

A. ***Prior Written Notice Not Issued by the Local Educational Agency***. If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, within 10 days of receiving the complaint, send to the parent a response that shall include:

   1. An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;
   2. A description of other options that the IEP Team considered and the reasons why those options were rejected;
   3. A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and

4.    A description of the factors that is relevant to the agency's proposal or refusal.

B.    Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **July 15, 2007**.

C.    ***Deficiency Notice***.   A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.    The deadline for filing a deficiency notice is **July 20, 2007**.

**DUE PROCESS HEARING**

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence.   A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

**QUESTIONS AND INFORMATION**

The staff with the Student Hearing Office does not provide legal advice.   The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law.   The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUCLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney:Fatmata Barrie, Esq.
Parent: Sharon Matthews**

Telephone Number: **(202) 626-0040**        Pages: **3**
Fax Number: **(202) 626-0048**        Date: **July 5, 2007**

---

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: **M▮▮▮▮▮ M▮▮▮▮▮**
School:  **Thomas ES**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office.  If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 548-2590.  Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

                              **Thank You
                              Marica Brown**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally privileged.  The information is intended only for use of the individual or entity named Above, if you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is Strictly prohibited.  If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

**Complaint Intake Unit**
**825 North Capitol Street, NE- 8th Fl.**
**Washington, DC 20002**
**(202) 442-5693**



# Fax

# Time Sensitive Materials Attached

**Prompt Attention: Principal/Administrator**
                    **Special Education Coordinator**

Telephone Number: **(202) 724-4593**                    Pages: **9**
       Fax Number: **(202) 724-5053**                    Date: **July 5, 2007**

---

**Please find attached a copy of a Scheduling Memorandum and a copy of the Due Process Complaint Notice regarding:**

Student: **M███████ M██████,**

School:  **Thomas ES**

**The complaint Intake Unit is responsible for only providing parties with information notice that a Due Process Complaint has been filed with the Student Hearing Office.  If you have questions about the attached Notice, regarding any fax errors or discrepancies, please contact the Complaint Intake Unit @ (202) 548-2590.**

                                        **Thank You,**
                                         **Marica P. Brown**
                                         **Staff Assistant**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally privileged.  The information is intended only for use of the individual or entity named Above, if you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is Strictly prohibited.  If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

33

# LAW OFFICES,
## CHRISTOPHER N. ANWAH, PLLC

Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
(DC, MD, NJ)
Fatmata Barrie, Esq.
(DC, FL)
Georgina A. Oladokun, Esq.
(DC, MD)
Allen Mohaber, Esq.
(MD)
Matthew Mixon, Esq.
(DC, MD)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

August 6 2007

**VIA FACSIMILE**
Student Hearing Office (SHO)
Van Ness ES
1150 5th St, SE
1st Floor
Washington, DC 20003

Re: Hearing Requests

Dear Sir/Madam:

Our office is requesting hearing dates for the following students because their complaints were filed over 30 days ago:



- J█████ P█████
  - DOB: ████/94
- J█████ W█████
  - DOB: ████/95
- M█████████████
  - DOB: ████/96
- J███ W█████
  - DOB: ████/92
- L████ Y█
  - DOB: ████/92

If you have any questions, please contact our office at (202) 626—0040. Thank you for your time.

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
1150 5th Street, S. E.
1st Floor
Washington, D.C. 20003
PHONE: (202) 698-3819
FAX: (202) 698-3825

 

### HEARING NOTICE

| MEMORANDUM VIA: [√ ] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:     Parent (or Representative):  **F. Barrie**          **Fax No.:** **(202)  626-0048**

LEA Legal Counsel:     **OGC**

RE:     **M▓▓▓▓▓, M▓▓▓▓**          and (LEA)  DOB: ▓▓▓96
        Student's Name

FROM:   ___SHARON NEWSOME_____
        Special Education Student Hearing Office Coordinator

DATE SENT:     **8/15/07**

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on 7/5/07. Please be advised that the hearing has been scheduled for:

   DATE:     8/31//07

   TIME:     9:00 & 11:00 AM

   AT:     1150 5th  Street, S. E. , Washington, D.C. 20003
           1st  Floor

   ASSIGNED HEARING OFFICER: _____

[ ] THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request to the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances are made **_exclusively_** by the Hearing Officer, and cannot be made by **SHO** administrative staff.  Unless you receive notice that the Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[√ ] THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates.  If you are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer.  If the SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you.  Disclosure of evidence and witnesses to the opposing party is required at least **five business days** prior to the hearing with copies to the Special Education Student Hearing Office.

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
1150 5th Street, S. E.
1st  Floor
Washington, D.C.  20003
PHONE: (202) 698-3819
FAX:  (202) 698-3825

 

### HEARING NOTICE

| MEMORANDUM VIA: [√ ] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:     Parent (or Representative):  **F. Barrie**                    Fax No.:  **(202)  626-0048**


LEA Legal Counsel:     **OGC**

RE:         M▇▇▇, M▇▇▇                        and (LEA) DOB: ▇▇/96
            Student's Name

FROM:  ____SHARON NEWSOME_____
            Special Education Student Hearing Office Coordinator

DATE SENT:     **8/15/07**

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on 7/5/07. Please be advised that the hearing has been scheduled for:

DATE:     **8/31//07**

TIME:     **9:00 & 11:00 AM**

AT:     1150 5th  Street, S. E. , Washington, D.C. 20003
            1st  Floor

ASSIGNED HEARING OFFICER: _____

[ ]  THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request to the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances are made *exclusively* by the Hearing Officer, and cannot be made by **SHO** administrative staff.  Unless you receive notice that the Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.


[√]  THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates.  If you are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer.  If the SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you.  Disclosure of evidence and witnesses to the opposing party is required at least *five business days* prior to the hearing with copies to the Special Education Student Hearing Office.

36

```
┌──────────────────────────────────────────┐
│      TRANSMISSION VERIFICATION REPORT      │
└──────────────────────────────────────────┘
                          TIME  : 08/15/2007 15:29
                          NAME  : STUDENT HEARING
                          FAX   : 2026983825
                          TEL   : 2026983819
                          SER.# : BROE6J471574
```

```
┌────────────────────────────────────────────────────────────┐
│                                                              │
│   DATE,TIME            08/15  15:28                           │
│   FAX NO./NAME         96260048                               │
│   DURATION             00:00:26                               │
│   PAGE(S)              01                                     │
│   RESULT               OK                                     │
│   MODE                 STANDARD                               │
│                        ECM                                    │
│                                                              │
└────────────────────────────────────────────────────────────┘
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
1150 5th Street, S. E.
1st  Floor
Washington, D.C. 20003
PHONE: (202) 698-3819
FAX: (202) 698-3825



### HEARING NOTICE

| MEMORANDUM VIA: [√ ] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
| --- |

TO:     Parent (or Representative): **F. Barrie**          Fax No.: **(202)  626-0048**


        LEA Legal Counsel:     **OGC**

RE:     M█████, M█████          and (LEA) DOB: ███/96
        Student's Name

FROM:   ___SHARON NEWSOME_____
        Special Education Student Hearing Office Coordinator

DATE SENT:     **8/15/07**

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on 7/5/07.
Please be advised that the hearing has been scheduled for:

        DATE:     8/31//07                                    37

        TIME:     9:00 & 11:00 AM

# LAW OFFICES OF
## CHRISTOPHER N. ANWAH, PLLC

Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
   (DC, MD, NJ)
Fatmata Barrie, Esq.
   (DC, FL)
Georgina A. Oladokun, Esq.
   (DC, MD)
Allen Mohaber, Esq.
   (MD)
Mathew Mixon, Esq.
   (DC, MD)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20005
Phone: (202) 347-7026
Fax: (202) 347-7108
Email: chrisanwahfirm@chrisanwahfirm.com

August 24, 2007

Office of General Counsel
825 North Capitol St, NE
9th Floor
Washington, DC  20002

Via Facsimile: 202-442-5098/97

RE:  M████ M█████
DOB:  ██/96

### Disclosure of Witnesses and Documents

To Whom It May Concern:

     Pursuant to the five-day rule set forth in 34.C.F.R. 509 (a) (3), attached is a list of witnesses whom we intend to rely on for the upcoming Due Process Hearing scheduled for August 31, 2007.

### Witnesses*

1. Carlton and Sharon Mathews – Parents, 3685 Jay St., NE #201 WDC 20019, 202-396-5428
2. M████ M█████ – Student, 3685 Jay St., NE #201 WDC 20019, 202-396-5428
3. Annie Pressley and/or designee -- Educational Advocate, 1003 K Street NW WDC 20001, 202-626-0040
4. David Clarke and/or designee -- High Road School, 1246 Taylor St., NW WDC 20011, 202-722-7900
5. Keren Plowden and/or designee – Rock Creek Academy, 4401 Connecticut Ave., NW, WDC 20008, 202-378-1392Anne Warnke and/or Designee – Accotink Academy, 8519 Tuttle Road, Springfield, VA  22152, 703-451-8041
6. Derek Marryshow and/or designee – Psychologist/Expert in Special Education, 5104 Aldershot Drive, Lanham, MD 20706, 301-333-2009
7. Sharon Millis and/or designee – Expert and/or Knowledgeable Person in Special Educational 1166 Cygnet Drive, Waldorf, Maryland, 20601, 301-870-6474

M████ M█████' 5-day
DOB: ████/96
Date: 08/24/07

1

8.  Terry Thompson and/or designee – Sylvan Learning Center, 11161 New Hampshire Ave., Ste 104, Silver Spring, MD 20904, 301-681-4710
9.  Lolita Fields and/or designee -- Sylvan Learning Center, 11161 New Hampshire Ave., Ste 104, Silver Spring, MD 20904, 301-681-4710
10. Amelia Williams and/or designee -- Sylvan Learning Center, 11161 New Hampshire Ave., Ste 104, Silver Spring, MD 20904, 301-681-4710
11. Debbie Markwitz, Esq. and/or designee – Sylvan Learning Center, 11161 New Hampshire Ave., Ste 104, Silver Spring, MD 20904, 301-681-4710
12. Kara Covington, Ph.D. and/or designee – Psychologist, THEARC, 1901 Mississippi, Ave., SE, WDC 20020, 202-436-3060
13. Dr. Hunt and/or designee – Psychologist, THEARC, 1901 Mississippi, Ave., SE, WDC 20020, 202-436-3060
14. Ellen F. Wiggins and/or designee – Licensed Social Worker, THEARC, 1901 Mississippi, Ave., SE, WDC 20020, 202-436-3060

*Witnesses may testify by telephone

## Documents

MM-01   07/05/07 Due Process Complaint
MM-02   06/05/7 MDT Meeting Notes w/SEP & Consent Form
MM-03   01/23/06 IEP
MM-04   Reports Cards
MM-05   Stanford Nine Scores
MM-06   01/24/05 IEP
MM-07   09/14/04 Settlement Agreement
MM-08   Sharon Millis, Harriet Lacewell and Derek Marryshow's Curriculum Vitae
MM-09   12/06/06 IEP
MM-10   07/05/06 Sylvan Learning Center Report
MM-11   10/27/06 Sylvan Learning Center Report
MM-12   02/07/06 Letter to DCPS
MM-13   02/11/06 Letter to DCPS
MM-14   03/02/06 Letter to DCPS
MM-15   07/23/06 Letter to DCPS
MM-16   08/08/06 Letter to DCPS
MM-17   Report Card
MM-18   List of Schools Needing Improvement
MM-19   07/03/06 HOD
MM-20   11/02/06 Suspension Letter
MM-21   07/24/07 Letter to DCPS
MM-22   07/17/07 Letter to DCPS
MM-23   September 2006 Comprehensive Psycho-educational Evaluation
MM-24   05/22/07 Letter to DCPS
MM-25   05/06/07 Letter to DCPS
MM-26   03/18/07 Letter to DCPS
MM-27   03/08/07 Letter to DCPS
MM-28   10/28/06 Letter to DCPS

M██████ M██████ 5-day
DOB: ████/96
Date: 08/24/07

2

We reserve the right to disclose additional documents as they become available, the right to rely on and call DCPS' witnesses and use DCPS' evidence as if disclosed by us and the right to rely on documents previously disclosed to counsel for any prior hearings or proceedings. We also reserve the right to produce rebuttal witnesses and to object to any expert witness without curriculum vitae. Should you have any questions or need additional information, please do not hesitate to contact me.

Sincerely,

Fatmata Barrie, Esq.

cc: SHO

M██████ M██████, 5-day
DOB: ██████/96
Date: 08/24/07

3

40

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MM-02
MDT

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**MEETING NOTES**

MDT REFERRAL DATE: _____

STUDENT: M_____ M_____    SCHOOL: Thomas ES    DATE: 06/05/07

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Sharon Matthews | Mother Sharon M. | Mother |
| Darcy Parris | S. Parris | SEC/LEA |
| Mrs Wheeler | teleconference | Psychologist |
| Marnie M Cato | Marnie M Cato, MS, CCC-SLP | Speech Pathologist |
| M. Manzano | M. Manzano | SPED Teacher |
| L. Bruner | L. Bruner | Class Teacher |
| Annie R Pensley | Annie R Pensley | Edu Advocate |

The purpose of the meeting is to review independent psychological
evaluation and a SEP meeting. Team is available. Parent has presented w/rights @ primary
meeting.
Parent states she is dissatisfied w/ daughter's performance.
Psychologist, Mrs Wheeler is available to review psychoeducational
evaluation.
Parent states M_____ is no longer receiving tutoring (July to Feb) 07
Mom states M_____ received tutoring from Sylvan.
FIQ 82 Low Avg. Processing speed 91 (wrong Memory) Low Avg. 84
Perceptual Reading 73 Borderline Verbal VMI → Low Avg 83
Low Visual Percep -77 →
Report was reviewed. Psychologist noted strengths. and concerns in
Picture completion IQ-92 VMI above avg. 110 - WJIII avg. low avg math
Phonemic decoding Math Low Avg. oral mat Avg. - Computation Low Avg (time test)
written cans. Low Avg. score, Mom states M_____ is not completing assignments
Cog. Low Avg; Avg abilities Academic Border line Low Avg Range
Math Avg. Soc. Emot. (ADHD) stated in report.
Psychologist reviewed recommendations. Parent agrees with report.
SEP meeting - Advocate states they are requesting OT, speech/language
~~evaluation~~ Visual integration, DCPS will agree to OT evaluation
Psychiatric (Advocate states because of ADHD) DCPS position is that
Childrens ~~psychiatric~~ did not recommend psychiatric. DCPS does not
recommend psychiatric, parent is recommended to take child to physician
about ADHD. Parent/advocate want psychiatric.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE: _____

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
MEETING TYPE: MDT

Page: 2 of 2

STUDENT: ▓▓▓▓▓▓    SCHOOL: Thomas

DATE: June 6, 07

Speech Pathologist reports: ▓▓▓▓▓▓ (Marnie M Cato)

▓▓▓▓▓▓ was initially evaluated on 12/10/04 to deter-her overall speech + language skills. The results of the evaluation revealed mild receptive language deficits + borderline expressive language skills. Instructional accommodations were made to address deficits. A re-evaluation was recommended to evaluate current speech + language skills by DCPS.

DCPS states student was tested 2 years ago & was found ineligible for speech services. DCPS does not recommend b/c report states ▓▓▓ speech is in average range according to Children's Hospital report.

Ms Bruner states ▓▓▓▓ can answer "wh" questions, follow multi step directions, but she has issue w/ main idea. ▓▓▓ is very detailed in steps & items in reading. ▓▓▓ needs prompting at times to answer question. Writing— sentence structure is fine but she sometimes loses topic. Writing may not have main idea, ▓▓▓ can repeat directives, ▓▓▓ responses to questions are brief.

Ms Bruner states ▓▓▓ can answer questions from lesson (one on one)

DCPS will agree to evaluate Student on OT & speech language

42

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MDT

CONSENT FOR EVALUATION - INITIAL OR REEVALUATION
(*CHECK ONE ONLY - INITIAL OR REEVALUATION)

**I.   INITIAL EVALUATION CONSENT** ☐

As a result of the review of the screening information at the MDT meeting on _____
it was determined in a MDT meeting that your child, _____
is in need of a full and individual evaluation to assist us in developing the most appropriate educational
program. You have been provided a copy of the "Procedural Safeguards - Parental Rights" booklet. We
would like to remind you at this time that:
- granting consent for this evaluation is a voluntary action on your part;
- this consent may be revoked at any time although the school district is required to take all
  necessary action to provide an appropriate program and may be required to initiate due
  process procedures to obtain consent; and
- by granting consent in writing, you are agreeing to the evaluation(s) in Section 111.

**II.   REEVALUATION** ☑

The MDT received the following request for a reevaluation for _M‌____ M‌_____
by /for a: ☑ **parent request**   ☐ **teacher request**   ☐ **3 year reevaluation**
The MDT will collect supportive documentation in the area of the disability to determine the need for
continued special education and related services. The school is required to only evaluate in those areas of
documented need or consensus of the MDT (parent is a member of team). Parents have the right to
request assessments to determine if their child continues to be a child with a disability. DCPS may
reevaluate your child, without your consent, if the school district can demonstrate that it has taken
reasonable steps to get parental consent and the parent has not responded.
- granting consent for this evaluation is a voluntary action on your part;
- this consent may be revoked at any time although the school district is required to take all
  necessary action to provide a Free Appropriate Public Education program and may be
  required to initiate due process procedures to obtain consent; and
- by granting consent in writing, you are agreeing to the evaluation(s) on the student
  evaluation plan (SEP) .

**III.**   I give permission for District of Columbia Public Schools to proceed with the evaluation(s) based on the
Student Evaluation Plan (attached ) for my child, _M‌____ M‌_____

Within a reasonable period of time days after completion of the evaluation, we will hold another MDT meeting (to which
you will be invited) to determine if your child is eligible for special education and related services. The written reports of all
procedures administered will be provided to you at that meeting, along with explanations and interpretations. We will use
this information to determine an appropriate program for your child. If records are to be obtained/released as part of
this evaluation, the "Consent for Release of Records" form is completed and attached.
If you have questions or concerns at any time during the evaluation process, feel free to contact me
at ~~724-4593~~ _____ (telephone number).

*☐ INITIAL EVALUATION          *☑ REEVALUATION

Parent Response Section:

☑ I agree to the proposed evaluation(s)          ☐ I do NOT agree to the proposed evaluation(s)

_Sharon Matthews_____          ___6|5|07_____
Parent/Guardian Signature                                    Date

DCPS     DIVISION OF SPECIAL EDUCATION     07-02-2001     MDT - CONSENT FOR EVALUATION     APPENDIX - A

43

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
DIVISION OF SPECIAL EDUCATION
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**STUDENT EVALUATION PLAN**
**(SEP)**

MDT
SEP

MDT REFERRAL DATE:

STUDENT: M████ M████        DOB: ██/96  AGE:  GRADE: 4  SCHOOL: Thomas    MEETING DATE: 6/5/07

STUDENT IDENTIFICATION NUMBER: 9076889       TEACHER / HOMEROOM: Bruner   Orejimi

ADDRESS: 3685 A Jay St NE #201     WDC 20019
Street #     Street Name,        Quadrant     Apartment #     City,  2)     State,     Zip Code

PARENT(S)/GUARDIAN: Sharon Matthews        TELEPHONE (H): 396-5428 (W):

Summarize Area(s) of Concern:

Visual perception (according to independent report)
receptive / language

Team Recommendations:

Occupational therapy evaluation (Children's report (recommendation
speech language

---

**EVALUATION(S) IN AREA(S) OF LEARNING CONCERN(S)**

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TIMELINE ASSIGNED | DUE DATE |
|---|---|---|---|---|
| ☐ Psychological | | | | |
| ☑ Speech/Language | Speech pathologist | TBA | | |
| ☐ Social History | | | | |
| ☐ Audiological | | | | |
| ☐ Vision Screening | | | | |
| ☐ Medical | | | | |
| ☐ Educational | | | | |
| ☐ Hearing Screening | | | | |
| ☑ Other | Other: OT | Other: TBA | | |

TEAM MEMBERS:   NAME              POSITION          TEAM MEMBERS:   NAME          POSITION

Sharon Matthews      Mother            J. Bruner        Classroom teacher
D'Farris             D'Farris          Ourie R Presley   Edu Advocate
Marnie M. Cato, MS CCC-SLP
M. Marcus            Sped Teacher

The MDT meeting to discuss the evaluation results is scheduled on _____ at _____ in room _____

Place completed form in MDT folder.
DISTRICT OF COLUMBIA PUBLIC SCHOOLS    07-02-2001    DIVISION OF SPECIAL EDUCATION    MDT - SEP    APPENDIX - A

44

6/5/07

Nd____ M____ ~ DOB: ____/86
MDT/SEP mtg.

Ms. Matthews is still dissatisfied with
N____ academic performance. The MDT
met off and a comprehensive eval by
Childre was submitted. An HOD was issued
ordering DCPS to convene an MDT/SEP mtg.
to determine if additional eval were warranted.
DCPS does not rec'd or did not rec'd testing
at the Childre's Learning Center. (See eval's for
detail. S/L was recommended which has not be
completed. The comprehensive psycho-ed
recommended an OT, S/L, and psychiatric
eval to rule ADHD ("CHI"). The
S/L therapist, Ms. Cato, stated, "that a
S/L eval was not warranted.
DCPS agrees to do the OT. DCPS alleges
that a psychiatric eval was not warranted
but that Mrs. Matthews should take N____
for consultation with private pediatrician.
Ms. Cato stated that N____ was tested
2 yrs and found ineligible; however, comp.
psycho recommend S/L to address
receptive and expressive eval. Mrs. Cato
will do the S/L blc although a parent still
requests the S/L to be completed to address
the students' reading deficit language

*Mrs.
Wheeler
school
psychologist*

45

Ms. Brunner, Classroom teacher, stated that M_____ does have difficulty with identifying main idea in the sentence. Ms. Brunner usually repeat the information and try to weed out the total details with some prompting. Sentence structure, M_____, does not stay on topic, and has to be redirected. When M_____ create her own sentence topic, she digress away from her own idea. Her spelling is low, and she sometimes able to retain the information due to retention difficulty, she does not remember the information at a later time. She has difficulty with antonyms and synonyms, although she is better at s____. M_____ can repeat what is said, but has difficulty retaining the information, and responses are generally brief. She does not participate in well in group discussion, but participates well with one-on-one in the classroom. The MDT determine that it will complete the O/T and S/L evaluation, but not the psychiatric evaluation. Ms Matthew requested that psychiatric be completed.

Annie R Brunley
Edu Advocate
6/5/07

46

MM-03

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.
INDIVIDUALIZED EDUCATIONAL PROGRAM

DCPS - IEP

**Additional Comments:**

## I. IDENTIFICATION INFORMATION

## II. CURRENT INFORMATION

Student Name: Last ▨▨▨▨    First M▨▨▨▨    MI

Date of IEP Meeting: 01/▨/2006

Student ID 9076889    Soc. Sec. No. ▨▨▨▨    Age: 9    Grade 03

Date of Last IEP Meeting: 01/24/2005

Gender ☒M ☐F    Date of Birth ▨▨/1996    Ethnic Group Black

Date of Most Recent Eligibility Decision: 01/24/2005

Address 3685 Jay St NE Apt 201    NE

**Purpose of IEP Conference:**
☐ Initial IEP    ☒ Review of IEP
☐ Requested Eval.    ☐ 3yr ReEval.

House No.    Street Name    Quadrant    Apartment #

Washington    DC    20019

City    State    Zip Code

Indicate Level of Standardized Assessment:
Level III

☐ Non-attending

Attending School Thomas Elementary    Home School

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS /

☐ BEHAVIOR    ☐ TRANSPORTATION

Parent    Ms. Sharon Matthews

☐ ESY    ☐ TRANSITION

Address of (if different from student):    ☒ Parent    ☐ Guardian    ☐ Surrogate

House No.    Street Name    Quad    Apt. No.    City    State    Zip Code

Telephone: Home (202) 396-5428    Work

### III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used In Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | English | Native Language | Oral |
| Parent | English | English | English | Native Language | Rdg./ Written |
| Home | English | English | English | Native Language | Instrument: |
| | | | | | Date: |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | | | SpecEd | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ses. | Time | Total | Ses. | Time | Total | Hr./ Min | D/W/M | | | # | wks/mos |
| Specialized Instruction | 0.00 | 0.00 | 0.00 | 5.00 | 2.00 | 10.00 | Hrs | Week | Special Education Teacher | 01/24/2006 | 10 | Month |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | TOTAL HOURS: | | 0.00 | | | 10.00 | | Total Combined Hours Per Week: | | | | |

### V. Disability(ies) Learning Disabled

Percent of time in Specialized Instruction and Related Services
☐ 0-20%    ☒ 21-60%    ☐ 61-100%

☐ (Check if setting is general Ed.)

Percent of time NOT in a General Education Setting    31.00%

### VI. IEP TEAM (Participants in the development of the IEP)    Print and sign your name below.

Ms. Sharon Matthews
  Parent
Ms. J. Fletcher    _J. Fletcher_    Student
  Special Ed Teacher
Mr. Houston    _[signature]_
  General Ed Teacher
D. Parris    _[signature]_
  LEA Representative
D. Parris    _[signature]_
  Principal or Designee

*I AGREE* with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature    Date

District of Columbia Public Schools    04-02-2004    Division of Special Education    Appendix - A    IEP Page 1 of 4

47

| Student Name   Mxxxxx   Mxxxxx | | Managing School   Thomas Elementary | DCPS - IEP |
|---|---|---|---|
| Student ID Number 9076889 | DOB xx/xx/1996 | Attending School   Thomas Elementary | Page 2 of 4 |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: ☐

**Academic Areas: (Evaluator)** J. Fletcher, Special Education Teacher

Math Strengths:

Impact of disability on educational performance in general education curriculum:

Reading Strengths:

Mxxxxx is beginning ro read words on a 2nd grade level.

Impact of disability on educational performance in general education curriculum:

Disablity negatively impacts her academic achievement.

Score(s) When Available

| | | |
|---|---|---|
| Math Cal. | 3..5 | 111 |
| Math Rea. | | |
| See goal page: | | |
| Date: | 12/20/2005 | |
| Rdg. Com | 2.5 | 93 |
| Rdg. Basic | 2.3 | 90 |
| Written Ex. | 1.6 | 77 |
| See goal page: 1 | | |
| Date: | 12/20/2005 | |

**Communication (Speech & Language) (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

Score(s) When Available

Exp.Lang. _____
Rec- Lang. _____
Artic _____
Voice _____
Fluency _____
Exp. Voc. _____
Rec. Voc. _____
See goal page: _____
Date: _____

**Motor/Health (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

Score(s) /Results
When Available

_____
_____
_____
See goal page: _____
Date: _____

**Social Emotional Behavioral Areas: (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

Score(s) When Available

_____
_____
_____
See goal page: _____
Date: _____

**Cognitive/Adaptive Behavior: (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

Score(s) When Available

_____
_____
_____
See goal page: _____
Date: _____

**Prevocational Skills: (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

Score(s) When Available

_____
_____
_____
See goal page: _____
Date: _____

| Student Name | M██████    M██████ | Managing School | Thomas ██ementary | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9076889 | DOB ██/██/1996 | Attending School  Thomas Elementary | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: ▨▨▨ |
|---|---|---|

Area addressed by goal:  Academic Areas: Reading

ANNUAL GOAL: (including mastery criteria.)

The student will demonstrate measurable growth in basic reading and reading comprehension skills as evidence by mastery of the following short-term objectives by 80%.

Provider(s):  Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will identify initial, medial and final consonant sounds in isolation and words, 80% accuracy over a consistent period of time. | | Monthly |
| The student will distinguish between likeness and differences of similar sounding words, with 80% accuracy over a consistent period of time. | | Monthly |
| The student will pronounce consonant blends in isolation and words, with 80% accuracy. | | Monthly |
| The student will pronounce long and short vowel sounds in isolation and words, with 80% accuracy. | | Monthly |
| M██████ will use phonetic awareness strategies to determine and pronounce familiar and unfamiliar words in text or isolation with 80% accuracy. | | Monthly |
| Given passage material (Fiction and nonfiction) at the student's instructional level, the student will use phonemic skills and rules for puntuation to read increasingly complex text with fluency and appropriate expression, 8 out of 10 opportunities over a consistent period of time. | | Monthly |

| EVALUATION PROCEDURE(S) |
|---|
| ☒ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☒ Documented Observation  ☐ Report  ☐ Other ____ |

ЄЄ/ЄІ ∃פ∀d    ⅂Ⅎ ᴚƎHd∀N∀ ᴚƎHdO⊥SIᴚHƆ    8⅋00092920Z    0S:SІ  ∠00Z/ІZ/60

| Student Name | M██████    M████ | Managing School | Thomas ░Elementary | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9076889 | DOB ███/1996 | Attending School  Thomas Elementary | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: ████ |
|---|---|---|

Area addressed by goal:  Written Expression

**ANNUAL GOAL: (including mastery criteria.)**

M██████ will demonstrate ate least one year growth in writng, as evidenced by mastery of the following short-term objectives by 80%.

Provider(s):  Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| The student will write words in manuscript/cursive with correct sizing, shaping and spacing of words with 80% accuracy. | | Monthly |
| Given a word list(s), at M██████ instructional level  use rules for spelling correctly mono- and multi-syllable words from dictation with 80% accuracy. | | Monthly |
| Given spelling words (from various word list, including sight word(s) at the student's instructional level, the student will correctly apply spelling rules and strategies to correctly spell familiar words with 80% accuracy. | | Monthly |
| Given a teacher or student writing prompt, the student will write sentences of increasing complexity using correct capitalization, punctuation, spelling and grammar, 8 out of 10 opportunities over a consistent period of time. | | Monthly |
| The student will distinquish between and write various types of sentences (declarative, interrogation, etc.) using correct capitalization, punctuation, spelling and grammar with 80% accuracy. | | Monthly |
| Given a student or teacher identified writing prompt, the student will use various strategies(webbing, graphic organizers, etc..) to organize information for writing about this topic, 8 ouf of 10 opportunities over a consistent period of time. | | Monthly |

**EVALUATION PROCEDURE(S)**

☒ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____

09/21/2007  15:50   2026260048   CHRISTOPHER ANWAH PL   PAGE  14/33

## DOCUMENTED LEVEL OF SERVICE
### Complete and attach to MDT/IEP meeting notes

| | | |
|---|---|---|
| School **Thomas Elementary** | Principal **R. Barnes** | Special Education Coordinator **D. Parris** |
| Date **01/31/2006** Case Manager **L. Kinzer** | | Assistant Director **Elva Gloster** |
| Student ~~Matthew~~ | DOB ~~/1996~~ Age **9** Grade **03** | Assistant Director **Elva Gloster** |

| Student ~~Matthew~~ ~~Matthews~~ | DOB ~~/1996~~ Age 9 Grade 03 ID# 9076889 | SSN# ~~~~ |
|---|---|---|

| Parent **Ms. Sharon Matthews** | Telephone (H) (202) 396-5428 | (W) |
|---|---|---|

Address: **3685**    Jay St NE Apt 201                     NE_    Washington                DC    20019
         Street#   Street                                  Quad  Apt. No.  City                State  Zip Code

REFERRAL SOURCE: (Check) ☐ 120 Day  ☐ Reeval.  ☐ HOD  ☐ SA.  ☐ MA  ☒ Annual

☐ Nonpublic  ☐ Residential  ☐ Citywide  ☐ Courts  ☐ Local School  ☐ Other:

Previous least restrictive environment (LRE Setting):    Out of general education classroom

---

## JUSTIFICATION FOR SETTING CONSIDERATION
### (Submit TAT/MDT Documentation)
#### SUPPORTIVE DATA/DOCUMENTATION

| 2. ACCOMMODATIONS/ MODIFICATIONS | 3. DATA REQUIREMENTS | | |
|---|---|---|---|
| small group, Setting, Repeated review/drill shortened assignements, small student teacher ratio | Current IEP | Yes ☒ | No ☐ |
| | Signatures of required participants (MDT notes) | Yes ☒ | |
| | Intervention Behavior Plan | Yes ☐ | |
| | Copies of current class work and homework assignments: | Yes ☒ | |
| | Medical Reports: | Yes ☐ | No ☐ |
| | Clinical Reports: | Yes ☐ | No ☐ |
| | Psychiatric Reports | Yes ☐ | No ☐ |
| | Medications: | Yes ☐ | No ☒ |
| | Attendance Record | Yes ☒ | |
| | Copies of most recent evaluation(s) | Yes ☒ | |

| 4. Results of all interventions: (TAT, MDT, etc. and attach meeting notes.) | 5. Resources needed for program implementation |
|---|---|
| IEP meeting | none |

---

### 6. CURRENT SETTING CONSIDERATIONS

| ROW | SETTING in neighborhood school (Determined through the IEP team.) | SERVICE PROVIDER (Based on documented need) | LEVEL OF SERVICE (Based on documented need) |
|---|---|---|---|
| 1 | ☐ in general education classroom setting | ☐ general educators with consultation from special education time | ☐ between 0% and 20% of service time |
| 2 | ☒ combination general education and resource classroom | ☒ combination of general educators, special educators and related service providers | ☒ between 21 % and 60% of service time |
| 3 | ☒ *out of general education classroom | ☐ special educators and related service providers | ☐ between 61 % and 100% of service time |

*In providing or arranging for the provision of nonacademic and extracurricular service and activities, including meals, recess period, and the services and activities, each public agency shall ensure that each child with a disability participates with non-disabled children in those services and activities (300.306) to the maximum extent appropriate to the needs of that child. (300.553) Nonacademic settings.

Check the level of need as indicated:
#### DIRECTIONS:

| | |
|---|---|
| If two or three boxes are checked in the Row 1, check LOW. If two or three boxes are checked in the Row 2, check MODERATE. If two or three boxes are checked in the Row 3, check HIGH. | If one box is checked in each row, check either MODERATE or HIGH, depending on the need of the student. |

| 7. LEVEL OF NEED | | |
|---|---|---|
| ☐ LOW | ☒ MODERATE | ☐ HIGH |

07-02-2001                                                    Attention: Technical Support Supervisor, Compliance Team

51



**Children's**
*National Medical Center*

Children's Health Project of DC
111 Michigan Avenue, NW
3.5 Floor, Room 400
Washington, DC 20010
Phone: 202-884-3033
Fax: 202-884-3008

### PEDIATRIC MOBILE CLINIC
### COMPREHENSIVE PSYCHOEDUCATIONAL EVALUATION

Name: M███████ M███████

Dates of Testing:  September 21, 2006
And            September 28, 2006

School:  Neval Thomas Elementary

Date of Birth: ███████, 1996

Grade: 4

Age at Testing: 10 years, 5 months

## REASON FOR REFERRAL

M███████ mother, Sharon Matthews, and her pediatrician, Dr. Rhonique Harris, requested a reevaluation due to academic concerns. According to her mother, she has been coded as a student with a specific learning disability and receives special education services at her school. However, Ms. Matthews reports that she feels that she has made little progress. A comprehensive psychoeducational evaluation was conducted to determine M███████ current cognitive, academic, and behavioral functioning in order to make recommendations to promote her academic and personal growth.

## SOURCES OF DATA

Beery-Buktenica Developmental Test of Visual-Motor Integration (VMI) - Fifth Edition
Comprehensive Test of Phonological Processing (CTOPP)
Conners' Parent Rating Scale - Revised: Long Version
Conners' Teacher Rating Scale - Revised: Long Version
Human Figure Drawings
Kinetic Family Drawing
Rapid Automatized Naming Test (RAN)
Roswell-Chall Diagnostic Reading Test of Word Analysis Skills
Rotter Incomplete Sentences Test
Test of Nonverbal Intelligence - Third Edition (TONI-3)
Test of Reading Comprehension - Third Edition (TORC-3) - Paragraph Reading subtest
Test of Word Reading Efficiency (TOWRE) - Form A
Wechsler Intelligence Scale for Children-Fourth Edition (WISC-IV)
Woodcock-Johnson III: Tests of Achievement (WJ-III) – Form A



Children's Health
Project of DC

52

10/15/2006  10:42    2023965428                    S                        PAGE  02

M█████ M█████                                                    Page 2

## IDENTIFYING INFORMATION AND RELEVANT HISTORY

M█████ is a ten-and-a-half-year-old youngster who lives in Northeast, Washington, D.C. with her mother and father, four adult siblings, nineteen-year-old brother, two nieces, and one nephew. Ms. Matthews reports that she and her husband have been experiencing marital discord for a lengthy period of time. They have begun the process of separating.

Ms. Matthews reports that M█████ was born following an uneventful pregnancy, weighing eight pounds at birth. She achieved developmental milestones within normal limits, e.g., speaking at eight months, walking at ten months, using short phrases at eighteen months, and being toilet trained at eighteen months. M█████ suffers from eczema and allergies. There is a family history of learning disabilities.

M█████ has attended Neval Thomas Elementary School since prekindergarten. She was retained in second grade and is currently coded as a student with a specific learning disability in reading. According to her mother, M█████ has made little progress despite receiving special education services. As a result, Ms. Matthews has enrolled her at Children's Learning Center where she is tutored for two hours weekly. She also reports that M█████ has difficulty paying attention at times. Ms. Matthews describes her daughter as having many friends and being well-liked by adults and peers. She also reports that M█████ enjoys jumping rope and playing with her nieces and nephew.

## PREVIOUS TESTING

M█████ was assessed at the Mobile Clinic in September 2004. On the WISC-IV, she earned a Low Average Full Scale I.Q. score of 81, an Average Processing Speed Index score of 100, Average Working Memory Index of 91, Low Average Perceptual Reasoning Index score of 84, and Borderline Verbal Comprehension Index score of 73. On the VMI, M█████ obtained a low end of Average score of 83, a Low Visual Perception score of 77, and an Average Motor Coordination score of 90. M█████ demonstrated variable reading skills with Low sight word reading and Low Average decoding skills and reading comprehension. Systematic instruction was indicated on the supplemental test of basic word analysis and word recognition skills. Her math skills ranged from Low Average to Average, while her written language skills placed within the Low to Low Average range. M█████ met criteria for a specific learning disability in the areas of reading and written language. A speech and language evaluation was also recommended.

PAGE  17/33              CHRISTOPHER ANWAH PL                    2025260048      15:50  09/21/2007

10/15/2006  10:42    2023965428                    S                                    PAGE  03

M████ M████                                                    Page 3

## BEHAVIORAL OBSERVATIONS

M████ presented as a cooperative and polite youngster who easily separated from her mother to accompany the examiner for testing. She demonstrated good persistence and attention throughout most of the evaluation. M████ consistently used self-talk to help process information and guide her performance. Her verbal responses varied in length. On some tasks, they were quite brief, requiring inquiry from the examiner. On other tasks, her responses were extensive, yet failed to provide the salient information to earn full credit. M████ completed paper-pencil tasks using a left-handed thumb-wrap grip. On math tasks, she frequently used her fingers to count. Given M████ overall good cooperation and effort, test results appear to be a reliable and valid assessment of her current cognitive, academic, and social-emotional functioning.

## TEST RESULTS (See Appendix for tests and scores)

## INTELLECTUAL FUNCTIONING

The WISC-IV is a highly structured measure of a child's performance on a variety of tasks, each of which is related to an important aspect of intellectual functioning. It is important to note that neither the WISC-IV nor any intelligence test gives an absolute measure of a child's intelligence. Rather, this test gives us information about how M████ functions in comparison to other children her age.

The WISC-IV is comprised of core and supplemental subtests. The core subtests are used to compute the Full Scale I.Q. score, as well as four index scores. M████ Full Scale I.Q. score of 84 (fourteenth percentile) fell in the Low Average range. She performed best on the index which measured her visual-spatial reasoning and nonverbal problem-solving skills, obtaining an Average Perceptual Reasoning Index score of 92 (thirtieth percentile). M████ Average Processing Speed Index score of 91 (twenty-seventh percentile) measured her ability to quickly complete paper-and-pencil tasks. She earned a Low Average Working Memory Index score of 86 (eighteenth percentile), which measured her auditory attention and working memory skills, and a Low Average Verbal Comprehension Index score of 83 (thirteenth percentile), which measured her verbal reasoning and acquired knowledge. Significant scatter was observed among her subtest scores, suggesting unevenly developing intellectual skills. A comparison of her current intellectual profile with that obtained in 2004 indicated a modest improvement in her higher order thinking skills (i.e., both her Verbal Comprehension and Perceptual Reasoning Index scores were higher in the current testing) and a modest decline in her processing skills (i.e., both her Working Memory and Processing Speed Index scores were lower in the current testing). Confidence intervals for M████ Full Scale and Index scores are

PAGE  18/33                              CHRISTOPHER ANWAH PL                    2025260048    15:50  /002/12/60

10/15/2006  10:42   2023965428                        S                              PAGE  04

M▮▮▮▮ M▮▮▮▮.                                                                Page 4

presented in the Appendix.  These provide the ranges in which her scores are expected to fall upon retesting when measurement error and normal variability are considered.

The WISC-IV is divided into a number of subtests.  A scaled score of 10 is considered Average.  A scaled score of 13 to 15 indicates Above Average functioning, while 5 to 7 indicates Below Average functioning.  Scores of 16 and higher are described as Superior. M▮▮▮▮ subtest scores are as follows:

| Verbal Comprehension | | Perceptual Reasoning | |
|---|---|---|---|
| Similarities | 8 | Block Design | 4 |
| Vocabulary | 6 | Picture Concepts | 13 |
| Comprehension | 7 | Matrix Reasoning | 9 |
| Information* | 5 | Picture Completion* | 5 |
| Word Reasoning* | 9 | | |
| Working Memory | | Processing Speed | |
| Digit Span | 7 | Coding | 9 |
| Letter-Number | 8 | Symbol Search | 8 |
| Sequencing | | Cancellation* | 11 |
| Arithmetic* | 7 | | |

*Optional Subtest

In the verbal comprehension domain, M▮▮▮▮ subtest scores ranged from Below Average to Average.  She demonstrated Average ability (thirty-seventh percentile) on the Word Reasoning subtest, for which she was presented with series of clues from which to identify a target word.  M▮▮▮▮ scored at the low end of Average (twenty-fifth percentile) on the Similarities subtest, for which she was required to provide a shared characteristic for pairs of objects or verbal concepts.  Her performance placed Below Average (sixteenth percentile) on the Comprehension subtest, which asked her to explain social and practical conventions.  M▮▮▮▮ also earned a Below Average score (ninth percentile) on the Vocabulary subtest, which asked her to expressively define increasingly more difficult words and a Below Average score (fifth percentile) on the Information subtest for which she was asked a range of factual questions.  An analysis of her verbal comprehension subtest profile reveals better developed reasoning abilities than acquired knowledge.

In the perceptual reasoning domain, M▮▮▮▮ subtest scores varied from Well Below Average to Above Average.  She displayed Above Average ability (eighty-fourth percentile) on the Picture Concepts subtest, for which she was asked to select pictures that were alike in some way (shared a common characteristic or category).  M▮▮▮▮ score was within the Average range (thirty-seventh percentile) on the Matrix Reasoning subtest, an untimed measure that required her to complete visually-presented analogies using a multiple-choice

55

10/15/2006  10:42     2023965428                    S                              PAGE  05

M███████ M████████                                                    Page 5

format.  She scored Below Average (fifth percentile) on the Picture Completion subtest, which provided a timed measure of her attention to visual detail by requiring her to identify essential missing elements in pictures.  M██████ had the most difficulty on the Block Design subtest, on which she scored Well Below Average (second percentile).  She was only able to earn credit for two of the easier items on this timed measure of visual-spatial thinking that required her to reproduce geometric patterns.  Although she successfully completed three additional items, she did not earn credit due to completing these tasks well past the time limit and having a forty-five degree rotation on one item.  An analysis of her perceptual reasoning subtest profile indicated well-developed reasoning abilities when time is not a factor and a motor response is not required.

M██████ subtest scores in the working memory domain varied from Below Average to Average.  She displayed low end of Average proficiency (twenty-fifth percentile) on the Letter-Number Sequencing subtest, which presented her with series of letters and numbers and asked her to repeat them in a specific order.  M██████ was able to reorder a four letter-number combination on this measure of working memory.  She scored Below Average (sixteenth percentile) on both the Digit Span and the Arithmetic subtests.  The former subtest was a measure of auditory attention requiring her to repeat numbers either in the same order as read by the examiner or in reverse order.  M██████ was able to repeat four digits forward and three digits backward.  The latter subtest required her to mentally compute solutions to orally presented word problems.

M██████ subtest scores in the processing speed domain clustered within the Average range.  Her performance placed at the sixty-third percentile on the Cancellation subtest, a paper-and-pencil task that presented her with arrays of randomly repeating objects for which she was asked to cross out the target figure.  Pictures in the first array were randomly placed on the page while those in the second array were arranged orderly in rows.  M██████ scored at the thirty-seventh percentile on the Coding subtest, which required her to copy symbols that were paired with numbers.  She worked diligently, making two errors, which she self-corrected, out of the forty-two items completed in the two minutes allotted for this task.  M██████ scored at the twenty-fifth percentile on the Symbol Search subtest, which required her to scan a search group and determine if one of two target symbols was present.  She made three errors out of the twenty-five items she was able to complete during the two-minute time allotment.

The Test of Nonverbal Intelligence – Third Edition (TONI-3) was administered to further assess M██████ nonverbal reasoning abilities.  The TONI-3 is an untimed, motor- and language-free measure that required her to complete visually-presented sequences, analogies, and patterns using a multiple-choice format.  On this administration of the TONI-3, M██████ placed in the Average range (thirtieth percentile), obtaining an I.Q. score of 92.  Her performance on the TONI-3 was commensurate with her WISC-IV Perceptual Reasoning Index, indicating that her reasoning abilities are age-appropriate when language, time, and motor demands are removed.

PAGE  20/33                    CHRISTOPHER ANWAH PL                    2025260048    15:50  09/21/2007

10/15/2006  10:42    2023965428                    S                        PAGE  06

M████ M██████                                                     Page 6

## INFORMATION PROCESSING

**Language and Phonological Processing:** The WJ-III Story Recall test was administered to assess M████ oral language development and meaningful memory. When asked to recall story details immediately after presentation, she scored in the Average range (thirtieth percentile). M████ ability to recall information after a thirty-minute delay was in the Low Average range (twelfth percentile), suggesting a weakness in her long-term storage and retrieval of information. Subtests from the Rapid Automatized Naming test were administered to assess word retrieval speed, which is a strong predictor of reading disabilities. On these tasks, M████ was required to quickly recognize and recall the names for familiar visual stimuli or symbols. Her number, object, and letter naming speed fell within the Average range (fiftieth, twenty-fifth, and twenty-fifth percentile, respectively), while her color naming speed fell Below Average (twentieth percentile). Overall, M████ scored within the Average range (thirtieth percentile), indicating age-appropriate lexical retrieval ability.

Selected subtests from the Comprehensive Test of Phonological Processing (CTOPP) were administered to assess phonological coding skills, which are strong predictors of reading disabilities. On the Elision subtest, which measured the extent to which M████ could say a word and then say what would remain after dropping out designated sounds, she scored in the Poor range (fifth percentile).    On the Blending Words subtest, which required her to identify a word which was presented one sound at a time, her score fell to the Very Poor range (below the first percentile).    M████ often added consonant sounds to create familiar words.

## VISUAL-MOTOR INTEGRATION

The Beery-Buktenica Developmental Test of Visual-Motor Integration (VMI) – Fifth Edition was administered as a supplemental test of visual-motor integration skills. When asked to copy increasingly complex geometric designs, M████ obtained a Low standard score of 78 (seventh percentile). On the VMI, she demonstrated difficulty with the integration of multiple parts within designs, spacing, and directionality. M████ score on the Motor Coordination subtest fell in the Below Average range (standard score of 87, nineteenth percentile) when asked to draw geometric figures within provided pathways. On the timed Visual Perception subtest, she was asked to identify matching geometric designs. Her standard score of 110 fell in the Above Average range (seventy-fifth percentile). M████ performance across these measures indicates that her visual perceptual ability is well developed for her age; in contrast her fine motor coordination and visual-motor integration skills fall below age expectations.

57

10/15/2006  10:42    2023965428                    S                         PAGE  07

M▒▒▒▒ M▒▒▒▒▒                                                          Page 7

## ACADEMIC ACHIEVEMENT

**Reading:** M▒▒▒▒▒ overall performance on WJ-III measures of reading skills fell in the Low range (fifth percentile).  When asked to read increasingly difficult sight words, her score also placed at the fifth percentile.  M▒▒▒▒▒ score fell in the Low range and at the second percentile on a test designed to measure her phonetic decoding skills by asking her to read nonsense words.  She was administered the Roswell-Chall Diagnostic Reading Test of Word Analysis Skills as an additional measure of her sight word reading and phonetic skills.  She demonstrated mastery of consonant sounds, consonant digraphs, naming capital and lowercase letters, and encoding single consonants.  M▒▒▒▒▒ demonstrated some difficulty identifying high frequency words, short vowel sounds in consonant-vowel-consonant (CVC) words, and encoding regular CVC words.  She had the greatest difficulty identifying consonant blends, short and long vowel sounds in isolation, words containing the rule of silent e, vowel digraphs, diphthongs and vowels controlled by r, and syllabication.  M▒▒▒▒▒ performance on the Roswell-Chall indicated the need for review of high frequency words and systematic instruction in phonetic decoding skills.  On the Test of Word Reading Efficiency (TOWRE), she was asked to read sight words and nonsense words within a given time limit.  M▒▒▒▒▒ sight word efficiency fell within the Poor range (sixth percentile) while her phonemic decoding efficiency fell within the Very Poor range (second percentile).  Her reading fluency on a timed WJ-III measure, which required her to read brief, linguistically simple sentences silently and mark them true or false placed in the Low Average range (tenth percentile).  M▒▒▒▒▒ also scored at the tenth percentile on a WJ-III literal reading comprehension task that required her to silently read one- to two-sentence passages and provide a missing word.  Her reading comprehension skills were further assessed on the Test of Reading Comprehension – Third Edition (TORC-3).  When asked to read paragraphs silently and answer multiple-choice questions, she scored at the low end of Average (twenty-fifth percentile).  M▒▒▒▒▒ ability to demonstrate her understanding of the reading material may have been helped by being able to select the correct answer rather than having to independently generate it as demanded by the WJ-III Passage Comprehension test.

**Mathematics:** M▒▒▒▒▒ overall performance across WJ-III mathematical achievement measures fell in the Low Average range (eighteenth percentile).  She displayed Average ability (thirty-fifth percentile) on a task that required her to solve paper-and-pencil computational problems.  M▒▒▒▒▒ was able to add, subtract, and multiply basic facts and use the regrouping operation.  She had trouble dividing even basic items, subtracting like-fractions, adding mixed fractions, and multiplying multi-digit numbers.  M▒▒▒▒▒ scored in the Low Average range (thirteenth percentile) on a timed task that required her to complete basic math facts.  She worked slowly, making one sign and one computational error out of the forty-five items she was able to complete during the three-minute time allotment.

10/15/2006  10:42    2023965428                    S                                    PAGE  08

▓▓▓▓▓ M▓▓▓▓▓                                                                    Page 8

▓▓▓▓▓ score placed in the Low Average range (eleventh percentile) on a test that required her to solve mathematical word problems presented to her orally and accompanied by visual and written information. She was successful on items requiring her to add and subtract basic facts and identify coin value, temperature, and time. However, M▓▓▓▓ had difficulty identifying coins of a specified amount, making change, and consistently counting change.

**Written Language:**  M▓▓▓▓ used an awkward left-handed thumb wrap grip when completing writing tasks. She printed all her responses. Although her letters were adequately formed with appropriate spacing within and between words, the overall appearance of her written output with its heavy but varying pencil pressure, frequent erasures, many misspellings, and irregular punctuation was rather messy. This was particularly true when M▓▓▓▓ was asked to complete the more challenging items on a sentence writing tasks. The mental effort she expended in attempting to meet the task requirements was evidenced in her deteriorating product.

M▓▓▓▓ overall performance on the WJ-III written language measures was in the Low range (fourth percentile). When required to spell words using a traditional dictation format, her score placed in the Low range (second percentile). Her spelling errors included "uridre" for <u>under</u>, "talb" for <u>table</u>, "coled" for <u>cooked</u> and "roile" for <u>floor</u>. When asked to generate simple sentences quickly using three target words to describe a picture on the WJ-III Writing Fluency test, M▓▓▓▓ demonstrated Low Average ability (thirteenth percentile). She wrote eighteen sentences in the seven minutes allocated for the task but was only able to earn credit on eleven items. M▓▓▓▓ failed to correctly spell the target words that were written out for her, did not write in complete sentences, or misspelled words to the extent that they were unrecognizable. She also scored Low Average (fifteenth percentile) when asked to compose sentences meeting specific criteria on the WJ-III Writing Samples test. M▓▓▓▓ lost credit due to frequent misspellings and producing sentences of limited content.

## SOCIAL AND EMOTIONAL FUNCTIONING

An assessment of M▓▓▓▓ behavioral and emotional functioning was conducted via norm-based rating scales that were completed by her mother and classroom teacher and objective and projective measures that were completed by M▓▓▓▓. Projective tests provide a forum for individuals to disclose sensitive issues that they may be unwilling or unable to discuss directly. Ms. Matthews completed the Conners' Parent Rating Scale: Revised – Long Version to obtain information regarding any possible attentional issues. Her responses did not produce any significantly elevated ratings. However, Ms. Matthews indicated that her daughter often must have things just so, talks excessively, and is poor in spelling. M▓▓▓▓ classroom teacher, Ms. Burke, completed the Conners' Teacher Rating Scale: Revised – Long Version. Her responses yielded a clinically significant

ZE/EZ  PAGE                        CHRISTOPHER ANWAR PL                        8⊅00⊅9⊅9Z0Z  0S:SL  ∠00Z/⊥Z/90

10/15/2006  10:42    2023965428                    S                    PAGE  09

Mellonee Matthews                                                      Page 9

elevation on the Cognitive Problems/Inattention and a moderate elevation on the Hyperactivity Scale. Ms. Burke's responses yielded clinically significant elevations on the Conners' ADHD Index, Conners' Global Index: Restless-Impulsive, and the Conners' Global Index: Total. Ms. Burke endorsed that Mellonee *Very Frequently* fails to finish things that she starts, is inattentive and easily distracted, and is not reading up to par. She also reports that Mellonee *Often* is restless in the squirmy sense; forgets things that she has already learned; is excitable and impulsive; fails to give close attention to details and makes careless mistakes in schoolwork; avoids, expresses reluctance or has difficulty engaging in tasks that require sustained mental effort; does not seem to listen to what is being said to her; talks excessively; loses things necessary for task activities; only pays attention to things she is interested in; does not follow through on instructions or fails to finish schoolwork; has difficulty organizing tasks or activities; and is poor in spelling.

Findings from projective measures reveal the Mellonee experiences sadness about the conflict between her parents, which she discussed at length during the testing. She worries that her father smokes and drinks and wishes he would stop. Mellonee feels loved and supported by both her parents. She enjoys spending time with her father and seeks out his attention. She perceives her mother as often consumed in caring for her grandchildren and as a result, she feels unappreciated and displaced within the family circle. Nevertheless, Mellonee derives pleasure in her role as an aunt. Although she feels that her mother sees her as smart, she doubts her own abilities and does not view herself as academically capable. While Mellonee admits that she frequently talks in class, she is disappointed when she must change seats due to her excessive talking. She aspires one day to be an actress.

## SUMMARY

Mellonee is a ten-and-a-half-year-old youngster who was referred for an evaluation by her mother and pediatrician due to concerns about her academic progress. She is coded as a student with a specific learning disability in reading. Throughout the assessment process, Mellonee displayed good persistence and effort despite variable attention.

Results of the cognitive assessment indicated overall Low Average ability (fourteenth percentile) with Average perceptual reasoning ability (thirtieth percentile) and processing speed (twenty-seventh percentile), and Low Average working memory (eighteenth percentile) and verbal comprehension (thirteenth percentile). On a supplemental test of nonverbal intelligence, Mellonee scored within the Average range (thirtieth percentile), which was commensurate with her performance on the WISC-IV Perceptual Reasoning Index. Assessment of her oral language skills revealed Average immediate story memory with Below Average delayed story memory. Mellonee rapid naming skills were Average for objects, letters, and numbers but Below Average for colors. Her phonological processing was in the Poor to Very Poor range for manipulating sounds and blending

PAGE  24/33                    CHRISTOPHER ANWAH PL                    2025260048    15:50  09/21/2007

10/15/2006  10:42     2023965428                    S                              PAGE  10

M████ M█████                                                                    Page 10

words.  Given M██████ Low Average Verbal Comprehension Index score and impaired performance on phonological processing measures, a speech and language evaluation is warranted. She demonstrated Above Average visual perceptual ability with Below Average motor coordination and Low visual-motor ability.  Given her deficits in motor coordination and visual-motor integration, an occupational therapy evaluation is warranted.

Results of the achievement testing indicated academic skills which varied from Low to Average.  M██████ demonstrated Low sight word identification and word attack skills in an untimed format.  Her word reading efficiency was equally deficient while a supplemental test of phonetic and word analysis skills indicated the need for systematic instruction across a range of decoding skills.   M██████ reading fluency fell in the Low Average range as did her literal reading comprehension when measured at the sentence level using a fill-in-the-blank format.  She demonstrated stronger reading comprehension (low end of Average) when asked to read paragraphs with comprehension measured in a multiple-choice format. M██████ math calculation skills placed within the Average range while her math fluency and math problem-solving skills were Low Average.  Her spelling skills fell in the Low range while her writing fluency and written language skills placed Low Average.  M██████ continues to meet the criteria for a Reading Disorder (DSM-IV 315.00) and a Disorder of Written Language (DSM-IV 315.2).  Her poor phonological processing is interfering with the development of her basic reading and spelling skills.  While her basic calculation skills fall within age expectations, M██████ is having difficulty with applied problem solving.  A speech-language evaluation would help clarify whether her weak reading comprehension, written expression, and math problem-solving are a function of her difficulties comprehending language or result from her poor reading skills.

Results of norm-based rating scales completed by M██████ teacher are consistent with a diagnosis of Attention-Deficit/Hyperactivity Disorder – Inattentive Type.  However, given M██████ significant academic deficiencies, it is not clear if her symptoms reflect a biologically-based disorder of attention or have developed in response to her struggles in learning.  If her attentional issues persist, once appropriate school interventions have been put in place, then an evaluation by a child psychiatrist or developmental pediatrician is warranted.  Projective measures reflect an awareness of her academic deficiencies, sadness, and anger as well as feelings of insecurity and displacement within her large family. M██████ would benefit from individual therapy to assist her in understanding her learning difficulties and to help her develop more effective coping skills.

10/15/2006  10:42   2023955428                S                        PAGE  11

M█████ M███████                                              Page 11


## RECOMMENDATIONS

### Further Evaluations and Interventions

1.  An occupational therapy evaluation is recommended to more clearly delineate M███████ difficulty with visual-motor integration and graphomotor skills.

2.  A comprehensive speech and language is recommended to gain a better understanding of M███████ receptive and expressive language skills and to make recommendations regarding additional educational interventions.

3.  M███████ would benefit from individual counseling to help her cope with the impending changes in her family structure and to assist her in feeling more secure within the family. Her parents may wish to consult the therapist on ways to minimize the impact of their discord and the separation upon M███████. The therapist should assist her in understanding her learning disabilities and their impact upon her academic progress as well as monitor her attentional functioning.

4.  If symptoms persist once more intensive remediation is in place, a consultation with a psychiatrist or pediatrician is recommended to further evaluate M███████ symptoms of Attention-Deficit/Hyperactivity Disorder -- Inattentive Type and determine if a trial of medication to address these symptoms may be beneficial.

### Educational Placement

5.  M███████ would benefit from a small, supportive, structured class environment with a small student-teacher ratio that is designed to meet the needs of students with specific learning disabilities in reading and written language. She requires a high degree of structure, support, and positive feedback in order to be successful. A separate program should also provide the related services (e.g., speech and language therapy, occupational therapy, and counseling) that may be necessary for M███████ to derive educational benefit.

### Classroom Accommodations

6.  To minimize auditory and visual distractions, M███████ should sit near the front and center of the room in close proximity to the teacher and the blackboard. Daily schedules and routines should be emphasized through calendars and wall charts. Systems for organizing space and materials should also be introduced and maintained to promote her success in the classroom.

62

10/15/2006  10:42    2023965428                    S                              PAGE  12

M▮▮▮▮ M▮▮▮▮▮                                                    Page 12

7.    M▮▮▮▮ will benefit from ongoing feedback on her progress.  Concrete illustrations with graphs and charts, when possible, would be extremely helpful.  She should be commended for her work and perseverance whenever possible.

8.    A written list or graphic where M▮▮▮▮ can check off completed steps or activities will be very useful in helping her monitor her work and in giving her immediate sense of accomplishment.  This will assist in the maintenance of attention.

9.    M▮▮▮▮ will do best when expectations and requirements are clearly stated and consistent systems and routines maintained.   A high level of consistency in scheduling will help provide organization and support.

10.    Given M▮▮▮▮ relative weakness in graphomotor and visual-motor integration, copying requirements may be difficult for her.  It is recommended that such requirements be reduced by providing her with a handout of materials to be copied.

11.    M▮▮▮▮ should receive instruction in keyboarding.  Classroom use of a keyboard, such as an AlphaSmart (available from www.edresources.com), or a regular computer with word processing capabilities is recommended to facilitate her writing skills.

12.    M▮▮▮▮ will do best with printed materials and worksheets that are visually clear and well organized.  Worksheets should have structured workspaces so she does not have to organize the page for herself.

13.    Because M▮▮▮▮ has difficulty performing tasks rapidly under pressure, provide her with ample time to complete work or shorten the assignments so they can be accomplished within the allotted time.

14.    Counting materials, sticks, play money, and measuring instruments are all concrete aids that will help in arithmetic calculation.  M▮▮▮▮ should not be discouraged from using her fingers for counting.

## Personal

15.    Classroom recommendations that pertain to the presentation of directions and instructions are also applicable at home.  Systems that reinforce verbal instructions for organizing space and materials should also be introduced.

16.    In order to encourage an interest in reading and for exposure to the rich language found in well-written children's literature, it is important that M▮▮▮▮ be read to aloud on a regular basis, pausing for questions (What happened?  Why did it happen?  What will happen next?   Will something else happen?) will aid comprehension and assist language development.

63

PAGE  27/33                          CHRISTOPHER ANWAH PL            2026260048      09/21/2007  15:50

M█████ M██████                                                              Page 13

17.    M███████should be encouraged to participate in an extracurricular activity in which she experiences success and enjoyment.


Kara Covington, Ph.D., LPC
Psychology Associate


Cherryl R. Smith, Ph.D.
Licensed Clinical Psychologist
D.C. License #PSY1127
Director
Diagnostic and Psychological Services


64

10/15/2006  10:42    2023965428                    S                                    PAGE  14

 M M                                                    Page 14

Dates of Testing:  September 21, 2006 and September 28, 2006

This appendix of scores is attached to a full evaluation report.  Scores should be interpreted within the context of  information provided within the report.

## APPENDIX

Tests Administered
(Scores are based on national norms.)

## MEASURES OF GENERAL INTELLECTUAL FUNCTIONING

Wechsler Intelligence Scale For Children-Fourth Edition (WISC-IV)
(Scaled Scores range from 1 to 19 with 10 as Average).
(Percentiles range from zero to 100 with 50 as Average).

| Verbal Comprehension | Scaled Scores | Percentiles |
|---|---|---|
| Similarities | 8 | 25 |
| Vocabulary | 6 | 9 |
| Comprehension | 7 | 16 |
| Information* | 5 | 5 |
| Word Reasoning* | 9 | 37 |
| | | |
| Perceptual Reasoning | | |
| Block Design | 4 | 2 |
| Picture Concepts | 13 | 84 |
| Matrix Reasoning | 9 | 37 |
| Picture Completion* | 5 | 5 |
| | | |
| Working Memory | | |
| Digit Span | 7 | 16 |
| Letter-Number Sequencing | 8 | 25 |
| Arithmetic* | 7 | 16 |
| | | |
| Processing Speed | | |
| Coding | 9 | 37 |
| Symbol Search | 8 | 25 |
| Cancellation* | 11 | 63 |

*Optional Subtest

PAGE  29/33                    CHRISTOPHER ANWAH PL                    2023965048      15:50  09/21/2007

10/15/2006  10:42     2023965428                    S                              PAGE  15

 M█████ M███████                                               Page 15

(I.Q. and Index scores range from 50 to 150.  The Average range is 90-109).

|                         | I.Q./Index | Percentile | 95% Confidence Interval |
|-------------------------|-----------|------------|-------------------------|
| Verbal Comprehension:   | 83        | 13         | 77-91                   |
| Perceptual Reasoning:   | 92        | 30         | 85-100                  |
| Working Memory:         | 86        | 18         | 79-95                   |
| Processing Speed:       | 91        | 27         | 83-101                  |
| Full Scale:             | 84        | 14         | 80-89                   |

**Test of Nonverbal Intelligence – Third Edition (TONI-3)**
(Standard Scores have a range from 1 to 20 and 10 is Average).

| Standard Score | Percentile |
|----------------|------------|
| 92             | 30         |

## PHONOLOGICAL PROCESSING

**Rapid Automatized Naming Test (RAN)**                              Percentile
| | Percentile |
|---|---|
| Colors  | 20 |
| Objects | 25 |
| Numbers | 50 |
| Letters | 25 |

**Comprehensive Test of Phonological Processing (CTOPP)**

|                         | Standard Score | Percentile |
|-------------------------|----------------|------------|
| Phonological Awareness  |                |            |
| Elision                 | 5              | 5          |
| Blending Words          | 2              | <1         |

## LEARNING AND MEMORY SKILLS

|                          | Grade Equivalent | Standard Score | Percentile |
|--------------------------|------------------|----------------|------------|
| WJ-III Tests of Achievement |               |                |            |
| Story Recall             | 3.2              | 92             | 30         |
| Story Recall – Delayed   | 2.3              | 82             | 12         |

66

PAGE  30/33           CHRISTOPHER ANWAH PL              2026260048       15:50  09/21/2007

10/15/2006  10:42    2023965428                S                        PAGE  16

M█████ M█████                                     Page 16

## VISUAL-MOTOR INTEGRATION

**Beery-Buktenica Developmental Test of Visual-Motor Integration (VMI) - 5th Edition** (Average range for Standard Scores is 90-109)

|  | Standard Score | Percentile |
|---|---|---|
| Visual-Motor Integration | 78 | 7 |
| Visual Perception | 110 | 75 |
| Motor Coordination | 87 | 19 |

## ACHIEVEMENT TESTS

**Woodcock-Johnson III: Tests of Achievement** (Mean for Standard Score = 100 ± 15 and Average range is 90 to 110; Grade equivalents should be interpreted with caution; they are less stable than standard scores)

|  | Grade Equivalent | Standard Score | Percentile |
|---|---|---|---|
| Academic Skills (a composite of Letter-Word Identification, Calculation, and Spelling) | 2.5 | 79 | 8 |
| Academic Fluency (a composite of Reading Fluency, Math Fluency, and Writing Fluency) | 3.0 | 81 | 10 |
| Academic Applications (a composite of Passage Comprehension, Applied Problems, and Writing Samples) | 2.4 | 81 | 10 |
| Broad Reading (a composite of Letter-Word Identification, Reading Fluency, and Passage Comprehension) | 2.4 | 75 | 5 |
| **Reading Subtest Scores:** |  |  |  |
| Letter-Word Identification | 2.3 | 75 | 5 |
| Reading Fluency | 2.7 | 81 | 10 |
| Passage Comprehension | 2.3 | 81 | 10 |
| Word Attack | 1.4 | 70 | 2 |
| Broad Written Language (a composite of Spelling, Writing Fluency, and Writing Samples) | 2.4 | 74 | 4 |

67

09/21/2007  15:50    2026260048        CHRISTOPHER ANWAH PL        PAGE  31/33

 M██████ Ma██████                                      Page 17

|                          | Grade Equivalent | Standard Score | Percentile |
|--------------------------|------------------|----------------|------------|
| **Writing Subtest Scores:** |              |                |            |
| Spelling                 | 1.8              | 70             | 2          |
| Writing Fluency          | 3.3              | 83             | 13         |
| Writing Samples          | 2.3              | 85             | 15         |
| **Broad Math** (a composite of Calculation, Math Fluency, and Applied Problems) | 3.3 | 86 | 18 |
| **Math Subtest Scores:** |                  |                |            |
| Calculation              | 4.1              | 94             | 35         |
| Math Fluency             | 3.4              | 83             | 13         |
| Applied Problems         | 2.6              | 82             | 11         |

**Roswell-Chall Diagnostic Reading Test of Word Analysis Skills**

| | |
|---|---|
| High Frequency Words | R |
| Consonant Sounds | M |
| Consonant Digraphs | M |
| Consonant Blends | SI |
| Short Vowel Sounds (in CVC words) | R |
| Short and Long Vowel Sounds (in isolation) | SI |
| Rule of Silent e | SI |
| Vowel Digraphs | SI |
| Diphthongs and Vowels Controlled by r | SI |
| Syllabication (and Compound Words) | SI |
| Naming Capital Letters | M |
| Naming Lowercase Letters | M |
| Encoding Single Consonants | M |
| Encoding Regular (CVC) Words | R |

M - Mastered
R - Review Indicated
SI - Systematic Instruction Indicated
NT - Not Tested

**Test of Reading Comprehension - Third Edition (TORC-3)**

|                     | Standard Score | Percentile |
|---------------------|----------------|------------|
| Paragraph Reading   | 8              | 25         |

68

 M▓▓▓▓ M▓▓▓▓▓                                   Page 18

### Test of Word Reading Efficiency (TOWRE)

|  | Standard Score | Percentile |
|---|---|---|
| Sight Word Efficiency | 76 | 6 |
| Phonemic Decoding Efficiency | 68 | 2 |

## RATING SCALES

**Conners' Rating Scale - Revised: Long Version (CPRS-R:L)**
(Percentiles of 94 or above indicate area of significant difficulty.)

| Subscale | Parent Mother T-Score | Teacher Ms. Burke T-Score |
|---|---|---|
| Oppositional | 49 | 55 |
| Cognitive Problems/Inattention | 59 | 70 |
| Hyperactivity | 54 | 62 |
| Anxious-Shy | 56 | 54 |
| Perfectionism | 53 | 45 |
| Social Problems | 45 | 50 |
| Psychosomatic | 47 | — |
| Conners' ADHD Index | 52 | 77 |
| Conners' Global Index: | | |
|     Restless-Impulsive | 52 | 83 |
|     Emotional Lability | 54 | 53 |
|     Total | 53 | 76 |
| DSM-IV: Inattentive | 51 | 77 |
|     Hyperactive-Impulsive | 49 | 60 |
|     Total | 51 | 74 |

# LAW OFFICES OF
# CHRISTOPHER N. ANWAH, PLLC

Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
 (DC, MD, NJ)
Fatmata Barrie, Esq.
 (DC, FL)
Georgina A. Oladokun, Esq.
 (DC, MD)
 Allen Mohaber, Esq.
 (MD)
 Mathew Mixon, Esq.
 (DC, MD)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

## FACSIMILE COVER LETTER

**DATE:** 09/21/07

**TO:** Terry Michael Banks, Esq.

**COMPANY:** SHO

**FAX NUMBER:** 202-698-3825

**FROM:** Fatmata Barrie, Esq.

**RE:** Documents for M██████ M███████

**TOTAL NUMBER OF PAGES INCLUDING COVER SHEET** _____

**MESSAGE:**

***CONFIDENTIALITY NOTICE***

The pages accompany this facsimile transmission contain information from the Law Offices of Christopher N. Anwah, PLLC which is confidential or privileged, or both. The information is intended to be for the use of the individual or entity named on this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately at (202) 626-0040 so that we can arrange for the retrieval of the original documents at no cost to you.

70

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
1150 5th Street, S. E.
1st Floor
Washington, D.C. 20003
PHONE: (202) 698-3819
FAX: (202) 698-3825



### HEARING NOTICE

| MEMORANDUM VIA: [ √ ] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:    Parent (or Representative):  **F. Barrie**                          Fax No.:  **(202)  626-0048**


LEA Legal Counsel:    **OGC**

RE:    **M███████, M██████**                          and (LEA)  DOB:
       Student's Name


FROM:    ____SHARON NEWSOME_____
         Special Education Student Hearing Office Coordinator

DATE SENT:    **8/31/07**                                        **REVISED COPY**

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
Please be advised that the hearing has been scheduled for:

       DATE:    **9/12/07**                              **Cont'd f/ 8-31-07**

       TIME:    **1:00 PM**

       AT:    1150 5th  Street, S. E. , Washington, D.C. 20003
              1st  Floor

       ASSIGNED HEARING OFFICER: _____

[ ] THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request to the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances are made *__exclusively__* by the Hearing Officer, and cannot be made by **SHO** administrative staff.  Unless you receive notice that the Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[√ ]  THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates.  If you are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer.  If the SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you.  Disclosure of evidence and witnesses to the opposing party is required at least **five business days** prior to the hearing with copies to the Special Education Student Hearing Office.    71

```
┌─────────────────────────────────────┐
│  TRANSMISSION VERIFICATION REPORT    │
└─────────────────────────────────────┘
                                    TIME  : 08/31/2007 13:49
                                    NAME  : STUDENT HEARING
                                    FAX   : 2026983825
                                    TEL   : 2026983819
                                    SER.# : BROE6J471574
```

```
┌────────────────────────────────────────────────────┐
│   DATE,TIME             08/31  13:48                 │
│   FAX NO./NAME          96260048                     │
│   DURATION              00:00:26                     │
│   PAGE(S)               01                           │
│   RESULT                OK                           │
│   MODE                  STANDARD                     │
│                         ECM                          │
└────────────────────────────────────────────────────┘
```

# District of Columbia Public Schools
## State Enforcement & Investigation Division
### STUDENT HEARING OFFICE
1150 5th Street, S. E.
1st Floor
Washington, D.C. 20003
PHONE: (202) 698-3819
FAX: (202) 698-3825



**HEARING NOTICE**

| MEMORANDUM VIA: [ √ ] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
| --- |

TO:    Parent (or Representative): **F. Barrie**              Fax No.: **(202) 626-0048**


LEA Legal Counsel:      **OGC**

RE:         M████, M█████                          and (LEA) DOB:
            Student's Name


FROM:    ___SHARON NEWSOME_____
            Special Education Student Hearing Office Coordinator

DATE SENT:       **8/31/07**                              **REVISED COPY**

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
Please be advised that the hearing has been scheduled for:                                72

        DATE:         9/12/07                              Cont'd f/ 8-31-07

```
                    ┌────────────────────────────────────────┐
                    │   TRANSMISSION VERIFICATION REPORT      │
                    └────────────────────────────────────────┘
                                    ·  ·   ·

                                        TIME : 08/31/2007 14:14
                                        NAME : STUDENT HEARING
                                        FAX  : 2026983825
                                        TEL  : 2026983819
                                        SER.# : BROE6J471574
```

```
┌──────────────────────────────────────────────────────────────────────┐
│                                                                        │
│   DATE,TIME                        08/31  14:14                        │
│   FAX NO./NAME                     94425098                            │
│   DURATION                         00:00:17                            │
│   PAGE(S)                          01                                  │
│   RESULT                           OK                                  │
│   MODE                             STANDARD                            │
│                                    ECM                                 │
│                                                                        │
└──────────────────────────────────────────────────────────────────────┘
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
1150 5th Street, .S. E.
1st  Floor
Washington, D.C. 20003
PHONE: (202) 698-3819
FAX: (202) 698-3825



#### HEARING NOTICE

| MEMORANDUM VIA: [√ ] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
| --- |

TO:    Parent (or Representative): **F. Barrie**        Fax No.: **(202)  626-0048**

LEA Legal Counsel:    **OGC**

RE:    M▬▬, M▬▬                                and (LEA) DOB:
       Student's Name

FROM:    ___SHARON NEWSOME_____
         Special Education Student Hearing Office Coordinator

DATE SENT:    **8/31/07**                        **REVISED COPY**

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
Please be advised that the hearing has been scheduled for:                    73

            DATE:        9/12/07                        Cont'd f/ 8-31-07

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

_____ )
_____ )          **BEFORE A INDEPENDENT**
         **Petitioner** )          **SPECIAL EDUCATION HEARING**
                        )          **OFFICER OF THE**
         **Vs.**        )          **STATE ENFORCEMENT**
DCPS                    )          **&**
_____ )          **INVESTIGATIVE DIVISION**
         **Respondent** )

### INTERIM ORDER

**ON THIS DAY** came to be heard _____Respondent_____'s Motion for Continuance in the above styled cause. After hearing the evidence and the argument of counsel, the Motion for Continuance is:

_____ **DENIED**

___X___ **GRANTED** The hearing is reset for _____ A.M. / P.M on _____ and

_____ **75 DAY TIME LINE WAIVED**

## CONFIRM THE NEW DATE & TIME WITH THE HEARING OFFICE COORDINATOR

### The Hearing Officer finds that there is good cause to grant the continuance because:

_____ The parties have agreed to this continuance and the parent waived the right to receive a
         final decision within 75 days.

_____ Petitioner's legal representation is unavailable. **(PLEASE CIRCLE ONE)** Diligent efforts have/have
         not been made to avoid or eliminate the scheduling conflict;

_____ Assigned DCPS attorney advisor is unavailable **(PLEASE CIRCLE ONE)** DCPS has/has not made a
         diligent effort to have an attorney advisor available;

_____ Witness(s) is/are unavailable. **(PLEASE CIRCLE ONE)** The party has/has not made diligent efforts
         to secure the witness(s);

_____ Parent or student unavailable.

_____ Conflict in the schedule of the assigned Hearing Officer. The SHO has/has not made a diligent
         effort to secure a replacement and no other Hearing Officer is available.

_____ Insufficient time allotted for the hearing. **(PLEASE CIRCLE ONE)**
                        A.) Parent
                        B.) Student Hearing Office

_____ Hearing room unavailable.

_____ Movant did not receive Prior Notice of the Hearing.

___X___ Other: (Explanation)
Respondent pleading improper a less than proper notice of hearing
due to receipt of notice with hearings scheduled for
September 2007
_____
_____

**SIGNED THIS DATE:** _08/31/07_____

ISSUE DATE: _____          _____Truesdale_____

                                     **Independent Special Education Hearing Officer**

Original to SHO – Hearing File
Copy to:     Parent/Student or Rep: _Barnie_____
             DCPS: _Lindsey_____
             Charter School: _____

Revised 11/01/2006 SHO     74

OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION
STUDENT HEARING OFFICE

```
---------------------------x
M▇▇▇▇▇ M▇▇▇▇▇,            :
                          :
           Petitioner,    :
                          :
           v.             :
                          :
DISTRICT OF COLUMBIA      :
PUBLIC SCHOOLS,           :
                          :
           Respondent.    :
---------------------------x
```

                              Van Ness Elementary
                              1150 5th Street, S.E.
                              Washington, D.C. 20003

                         Wednesday, September 12, 2007

          The HEARING in this matter began at
approximately 12:23 p.m., pursuant to notice.

BEFORE:

          COLES RUFF
          Hearing Officer

APPEARANCES:

    On behalf of Petitioner:

        FAMATA BARRIE, ESQUIRE
        Parent Counsel

    On behalf of Respondent:

        AARON PRICE, ESQUIRE
        Attorney Advisor
        D.C. Public Schools

ALSO PRESENT:

        SHARON MATTHEWS
        Parent

*    *    *    *    *

```
 1              P R O C E E D I N G S
 2                                        (12:23 p.m.)
 3           MR. RUFF:  Okay.  Good afternoon, today's date
 4   is September 12, 2007, I'm Coles Ruff independent hearing
 5   officer.  This is an administrative due process hearing
 6   conducted under the Individuals with Disabilities
 7   Education Improvement Act.  This is in the matter of
 8   M██████ M██████.  M██████ date of birth is ██████,
 9   1996, is that correct?
10           SPEAKER:  Yes.
11           MR. RUFF:  Okay.  And the school of attendance
12   is Thomas Elementary.
13           SPEAKER:  Options Public Charter School.
14           MR. RUFF:  Options Public Charter School.
15   Options Public Charter School.  Could you all identify
16   yourself, please?
17           MR. PRICE:  Good afternoon.  Aaron E. Price Sr.
18   Assistant attorney general on behalf of District of
19   Columbia Public Schools.
20           MS. BARRIE:  Good afternoon.  Famata Barrie,
21   attorney for the mother.
22           MS. MATTHEWS:  And I'm Sharon Matthews --
```

1    M▮▮▮▮▮ M▮▮▮▮▮' mother.

2              MR. RUFF:  Okay.  You waive a formal reading of

3    the rights Ms. Barrie?

4              MS. BARRIE:  Yes, sir.

5              MR. RUFF:  Okay.  It's my understanding, based

6    upon the conversations that were had prior to coming on

7    the record, that you all have agreed to reach a settlement

8    in this agreement, and you'll do that settlement off the

9    record and in documents that you all will exchange, is

10   that -- my understanding is correct?

11             MS. BARRIE:  Yes.

12             MR. PRICE:  That is correct.

13             MR. RUFF:  Okay.  So what I'll do is I'll note

14   for the record this matter was settled, and I've got the

15   sign-in sheet.  And so we are adjourned, thank you very

16   much.

17             SPEAKER:  Thank you.

18             (Whereupon, at 12:24 p.m., the HEARING was

19             adjourned.)

20                        *   *   *   *   *

```
      OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION
                 STUDENT HEARING OFFICE

    --------------------------x
    M▮▮▮▮▮▮ M▮▮▮▮▮▮,          :
                              :
                 Petitioner,  :
                              :
              v.              :
                              :
    DISTRICT OF COLUMBIA      :
    PUBLIC SCHOOLS,           :
                              :
                 Respondent.  :
    --------------------------x
```

                              Van Ness Elementary
                              1150 5th Street, S.E.
                              Washington, D.C. 20003

                         Wednesday, September 12, 2007

        The HEARING in this matter began at
    approximately 2:22 p.m., pursuant to notice.

BEFORE:

        TERRY BANKS
        Hearing Officer

                   Soft Scribe LLC
                www.softscribellc.com
                    (703) 373-3171

APPEARANCES:

    On behalf of Petitioner:

        FAMATA BARRIE, ESQUIRE
        Parent Counsel

    On behalf of Respondent:

        AARON PRICE, ESQUIRE
        Assistant Attorney General
        D.C. Public Schools

*   *   *   *   *

3

# C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Kara Covington | 17 | 26 | 31 | |
| David Clark | 41 | 46 | 51 | |

\*   \*   \*   \*   \*

Soft Scribe LLC
www.softscribellc.com
(703) 373-3171

```
 1            P R O C E E D I N G S
 2                                        (2:22 p.m.)
 3         MR. BANKS:  Today is September 12, 2007.  This
 4  is an administrative hearing for M███████ M███████, who
 5  was born ██████████, 1996.  This hearing is being conducted
 6  in accordance with the guidelines and rights established
 7  by the Individuals with Disabilities Education Improvement
 8  Act of 2004.  The rules of the board of education for the
 9  District of Columbia in D.C. Code title 38.
10         My name is Terry Banks.  As an independent
11  hearing officer, I am not an employee of the D.C. Public
12  Schools, I am not related to, or an acquaintance of the
13  student or parent.  I'm prepared to hear both parties, and
14  will act only on the evidence presented during the course
15  of this hearing in accordance with applicable laws, rules
16  and regulations.
17         This hearing is closed to the public.  The
18  matters discussed here today are confidential and must be
19  treated as such even after the hearing is completed.  The
20  hearing is being recorded, and either party may request a
21  copy of the disc or a written transcript of the
22  proceedings by writing to the Student Hearing Office.  At
```

1  this time, I would like everyone to identify themselves

2  for the record.

3          MR. PRICE:  Good afternoon.  Aaron E. Price Sr.

4  Assistant attorney general on behalf of D.C. Public

5  Schools.

6          MS. BARRIE:  Good afternoon.  Famata Barrie,

7  attorney for the parent.

8          MR. BANKS:  Good afternoon.  Ms. Barrie, do you

9  waive a reading of the hearing rights?

10         MS. BARRIE:  Yes.

11         MR. BANKS:  Mr. Price, do you have a disclosure?

12         MR. PRICE:  There appears to be no DCPS

13 disclosure.

14         MR. BANKS:  Ms. Barrie -- do you have any

15 opposition to Ms. Barrie's disclosure?

16         MR. PRICE:  I don't have them.  I'm sure they

17 were submitted, and I can assume they were submitted

18 timely.

19         MR. BANKS:  So you have no objection?

20         MR. PRICE:  To timeliness, no, but --

21         MR. BANKS:  Do you want to look at it and see if

22 you have any objection?  Okay.  Without objection

1  Petitioner's disclosure is admitted.  Okay.

2          And just so that I understand what's going on

3  today, as I understand it, Ms. Butler-Truesdale was

4  supposed to handle this case, but her case ran over.  She

5  asked Mr. Ruff to handle the case.  Mr. Ruff was led to

6  believe by the parties that they had settled the case.

7  And so he didn't proceed, and then the parties came back

8  to the table, and Mr. Ruff concluded that I ought to have

9  it, because I had the child once before and Ms. Butler-

10  Truesdale was gone.  So I just want you to know how I got

11  into this.  Okay.  Ms. Barrie, would you like to --

12          MS. BARRIE:  Yeah, I --

13          MR. PRICE:  Mr. Hearing Officer, I believe, I

14  have a preliminary matter before we get to opening, I

15  think, I need to dispose --

16          MR. BANKS:  Uh-huh.

17          MR. PRICE:  -- (inaudible).  We're here on a

18  complaint that was filed -- the date of the complaint that

19  I have is 12/13/06.

20          MR. BANKS:  No, July 5th.

21          SPEAKER:  No, July.

22          MR. PRICE:  July 5th, okay.

1             SPEAKER:  July 5th.

2             MR. PRICE:  I'm sorry.

3             SPEAKER:  '07.

4             MR. BANKS:  '07.

5             MR. PRICE:  July 5, '07, okay.  We're here on a

6    complaint that was filed July 5, '07, and in reviewing

7    that complaint, the issues that are in that complaint were

8    the placement for the '05-'06 school year, inappropriate

9    IEP for the '05-'06 school year, failure to conduct

10   evaluations, failure to provide certain special education

11   related services and a claim for comp-ed.  However, DCPS

12   asked the hearing officer to take a judicial notice of the

13   HOD, which I think -- which brings the hearing officer

14   here.

15            The hearing officer before us, namely yourself,

16   issued an HOD on April 25, 2007, and in the introduction

17   of the HOD, you identified the issues that were brought at

18   that time, and I want to quote.  "Failure to comply with

19   the HOD is issue number 1, number 2 is development of

20   appropriate IEP, 3 was providing necessary services, 4 an

21   appropriate placement, evaluations is 5, 6, is allow the

22   parent opportunity to participate.  Number 7 is due

```
 1   process rights, failure to do a formal -- due process

 2   rights and number 8, failure to provide compensatory

 3   education.

 4           At bottom, through this lengthy HOD, the hearing

 5   officer dismissed the complaint with prejudice.  Thus DCPS

 6   will present the exact issues, which I read were

 7   delineated and the complaint which brings us here today

 8   are all based -- squarely -- barbed on the theory of res

 9   judicata.

10           I mean, this is not an instance where the

11   hearing officer dismissed the complaint and didn't

12   indicate that it was dismissed with prejudice.  In this

13   instance, we have a complaint that -- an HOD that clearly

14   reached the merits of each one of those claims, and the

15   hearing officer expressly indicated, dismissed with

16   prejudice.  Not dismissed count 1, count 2, or count 3,

17   but dismissed the entire complaint.  According to DCPS, at

18   present, there's no justiciable issue before us.  And

19   that's a copy of the hearing officer's HOD for judicial

20   notice, I'm sure the hearing officer is aware of.

21           MR. BANKS:  Ms. Barrie?

22           MS. BARRIE:  Okay.  I was going to start with
```

1   probably what should've been done before, but to strike

2   out the issues dealing with 2005-2006 school year.  One --

3   the major issues that we have in this complaint are that

4   part of that HOD discusses orders that come in a SEP

5   meeting.  The meeting was held in June 5, 2007.  And in

6   that HOD, the hearing officer delineated the fact that he

7   did not want at the time the psychologists to testify,

8   because DCPS at the time had not reviewed the

9   psychological evaluation in the meeting.  And as a result,

10   according to that HOD, and according to the hearing

11   officer, this hearing officer at that hearing, he did not

12   want to hear from the psychologist, and he did not really

13   take --

14              MR. BANKS:  That was stuff that was post

15   complaint?

16              MS. BARRIE:  I'm sorry?

17              MR. BANKS:  Did I say it was post complaint?

18              MS. BARRIE:  No.

19              MR. BANKS:  Why didn't I want to hear from him?

20              MS. BARRIE:  You said because DCPS had not

21   reviewed a psychological -- the independent psychological.

22              MR. BANKS:  Oh --

1          MR. PRICE:  If --

2          MS. BARRIE:  That was a --

3          MR. PRICE:  If I may?

4          MS. BARRIE:  -- it was done at Children's -- by

5   Children's at the time.  And I was going to have Dr.

6   Covington (phonetic) at the time testify to that

7   psychological where you indicated that -- where DCPS

8   indicated that they had not reviewed it yet.  And so you

9   didn't want to hear from Dr. Covington at the time.

10          MR. BANKS:  I think it was post-complaint.

11          MS. BARRIE:  No, it was done before the

12  complaint.

13          MR. PRICE:  There was no indication that DCPS --

14  a copy was provided --

15          MR. BANKS:  Oh it's provided to DCPS --

16          MR. PRICE:  -- to DCPS.  And then the hearing

17  officer made his brisk finding of fact to that regard.

18          MR. BANKS:  Okay.

19          MS. BARRIE:  Right, DCPS said they had not

20  received it.  The mom said she think she give it to them,

21  but --

22          MR. BANKS:  But there was no documentation,

1    okay.

2              MS. BARRIE:  Right.

3              MR. BANKS:  Okay.

4              MS. BARRIE:  Right.  Because it wasn't from my

5    office the mom took it.

6              MR. BANKS:  Right.

7              MS. BARRIE:  And -- so hearing officer ordered

8    the meeting.  The meeting was held in June 5, 2007.  They

9    reviewed the psychological evaluation and though the

10   psychological recommended a structured environment, they

11   didn't go through that -- with that.  They said they want

12   to have evaluations completed.  They ordered -- they

13   recommended certain evaluation, an OT and a speech and

14   language evaluation.  The evaluations have not yet been

15   completed, and that's in the complaint.  And they denied

16   to give her the placement that the parent requested and at

17   that meeting the evaluation also --

18             MR. BANKS:  Yeah, yeah, slow down.

19             MS. BARRIE:  I'm sorry.

20             MR. BANKS:  So you had the meeting in June?

21             MS. BARRIE:  June the 5th.

22             MR. BANKS:  And at that meeting, certain

1    evaluations were --

2            MS. BARRIE:  -- were recommended by the team, an

3    OT and a speech and language evaluation.  We requested a

4    psychiatric -- or an evaluation to address the --

5            MR. BANKS:  Wait a minute, wait a minute, evals

6    recommended were OT and what else?

7            MS. BARRIE:  Speech and language evaluation.

8            MR. BANKS:  Okay.  And then --

9            MS. BARRIE:  We requested a psychiatric to

10   address the ADHD.  They then said, well, you need to --

11   she -- the mother needs to take the child to her doctor if

12   they want to address the issue of ADHD.  So that's in our

13   complaint.  And they did not give her the placement, or --

14   recommended by the psychological evaluation even though

15   their psychologist was not the one to evaluate her.

16            And as a result, we filed a complaint based on

17   the fact that now they have the evaluation, now they've

18   reviewed it, and they said it might be part of the

19   services as indicated in the psychological (inaudible) if

20   she needed it.  And now I have the psychologist to testify

21   to that, and we don't have the psychological -- we don't

22   have the evaluations that were recommended at that

1    meeting.

2             And we felt it was inappropriate for them to

3    direct the mother to go to her doctor when even the IDEA

4    requires that even if it's a medical testing, they have to

5    do it, when it -- when it has to do with the educational

6    fees for the student.  And as I indicated, that's -- the

7    issues for 2005-2006 school year that were addressed by

8    the HOD we'll strike off our complaint, and what --

9             MR. BANKS:  So you can see that the -- that as

10   res judicata is there within -- preceding the date of the

11   HOD?

12            MS. BARRIE:  Exactly.  And -- but from that

13   moment forward, DCPS had an obligation to complete

14   evaluations, had an obligation to complete a meeting that

15   was ordered.  And they reviewed the evaluations --

16            (Tape interruption)

17            MR. BANKS:  -- the HOD.

18            MS. BARRIE:  Oh.

19            MR. BANKS:  Did you contact the coordinator at

20   Thomas to attempt to bring the case into compliance before

21   filing a request?

22            MS. BARRIE:  No, they held a meeting, it's on an

1    HOD violation.

2              MR. BANKS:  Oh, okay, so you're -- right.  So

3    they did what I said.

4              MS. BARRIE:  They held a meeting --

5              MR. BANKS:  But now you're complaining about

6    what happened there?

7              MS. BARRIE:  Correct.

8              MR. BANKS:  Okay.

9              MS. BARRIE:  They held a meeting.

10             MR. BANKS:  Okay.  Well, I'll tell you what, I'm

11   going --

12             (Tape interruption)

13             MR. BANKS:  -- on the res judicata piece, so I

14   will take testimony on everything subsequent to their last

15   HOD and then review the disclosures to see if I find a

16   violation.

17             MS. BARRIE:  And just so we're clear on some of

18   it, the hearing officer indicated at the beginning, how

19   the hearing officer got involved in the case.  I just want

20   it to be clear on the record, why -- the reason the parent

21   left was because we were under the impression that the

22   case was settled and that DCPS was offering placement at

1   High Road.  And as counsel -- as parent's counsel, I

2   informed the parent of that fact and the parent left due

3   to that fact.

4          As far as parties coming back, it wasn't out of

5   choice from the parent's counsel.  I was contacted after

6   I'd already left the premises, that I have to come back,

7   because the offer had now been recanted.  And that's why I

8   came back.  Not so much that the parties decided to come

9   back and do the hearing.

10         MR. BANKS:  Okay.  Well, all I can say is that,

11  you know, it wasn't done on the record before Mr. Ruff.

12  There's nothing in writing.  So there's not much I can do

13  about it at this point.

14         MS. BARRIE:  No, I know.  All that was on the

15  record was that we indicated on the record, we were going

16  to settle on the record, that was --

17         MR. BANKS:  Okay.  So you have one witness, is

18  that it?

19         MS. BARRIE:  Maybe two, I'm going to keep

20  trying, I'm hoping the mom went home instead of to her --

21         MR. BANKS:  Who is this witness?

22         MS. BARRIE:  Dr. Covington, Kara Covington

1    (phonetic).

2            MR. BANKS:  C- --

3            MS. BARRIE:  C-o -- C-o-v --

4            MR. BANKS:  No, first name.

5            MS. BARRIE:  Oh, first name is K-a-r-a.

6    Covington.

7            MR. BANKS:  Okay.

8            MS. BARRIE:  Hi, Dr. Covington, it's Ms. Barrie

9    and I'm sorry for being so late.  Okay.  I'm going to put

10   you on speaker phone and the hearing officer's going to

11   swear you in, okay?  Can you hear me?

12           MS. COVINGTON:  Yes.

13           MR. BANKS:  Okay.  Ms. Covington?

14           MS. COVINGTON:  Yes, sir.

15           MR. BANKS:  Is it doctor or miss or?

16           MS. COVINGTON:  Dr. Covington.

17           MR. BANKS:  This is Terry Banks.  I'm the

18   hearing officer.

19           MS. COVINGTON:  Yes, hi.

20           MR. BANKS:  How are you?

21           MS. COVINGTON:  Fine thank you.

22           MR. BANKS:  I'm going to place you under oath.

1    You'll be asked questions by Ms. Barrie.  When she's done,

2    you'll be cross-examined by Mr. Aaron Price who's counsel

3    for the school system.

4              MS. COVINGTON:  Okay.

5    Whereupon,

6                        KARA COVINGTON

7    was called as a witness and, having been first duly sworn,

8    was examined and testified as follows:

9              MR. BANKS:  Go ahead, Ms. Barrie.

10             MS. BARRIE:  Okay.

11             DIRECT EXAMINATION

12             BY MS. BARRIE:

13     Q     Dr. Covington?

14     A     Yes.

15     Q     Are you aware of M██████ -- well, first of all,

16    I was going to -- can you give us your educational

17    background, please?

18     A     My educational background?

19     Q     Yes, please.

20     A     I have a bachelor's degree in psychology from

21    the University of Virginia, a master's degree in special

22    education from American University, and a doctor of

```
 1   philosophy from Howard University in school Psychology.

 2        Q    Dr. Covington?

 3        A    Yeah.

 4        Q    How are you currently employed?

 5        A    I am a psychology associate at Kingsbury Center,

 6   and we also have a contract with Children's Hospital,

 7   children's health project of D.C., where I do assessments

 8   once per week.

 9        Q    So -- in your estimation, how many students have

10   you -- well, have you done evaluations on students before?

11        A    Yes, I have.

12        Q    In your estimation, can you tell us how many

13   students you may have evaluated?

14        A    Oh, I'd have to say, oh, probably about 200

15   students.

16        Q    Okay.  Do you provide any psychological

17   counseling to any students?

18        A    I do, I provide psychological counseling here at

19   Kingsbury, but not at Children's Hospital.

20        Q    You have a full load?

21        A    Yes, I do.

22        Q    Okay.  Now, are you aware of M██████ M██████?
```

1      A    Yes, I am.

2      Q    And how do you know M_____?

3      A    M_____ came through the mobile clinic and she

4  was referred by her pediatrician on two occasions, for a

5  psychoeducational evaluation.

6      Q    On two different occasions?

7      A    Yes.

8      Q    Okay.  And did you do an evaluation on M_____?

9      A    I did both evaluations on M_____.

10      Q    Okay.  Now, when you did the evaluations on

11  M_____, what if anything did you find?

12      A    I -- primarily discussed her initial -- do you

13  want me to discuss her initial?

14      Q    Yes, please.

15      A    Okay.  Her initial evaluation was done September

16  2004, and what we found was that she met criteria for a

17  specific learning disability in the area of reading and

18  written language.  And her sight word reading was in the

19  low levels, the connections were at the low average level

20  as well as her reading comprehension.  And she also was

21  found to need systematic instruction in basic word

22  analysis and word recognition skills.

1            MR. BANKS:  I'm sorry, what were the areas where

2    she was deficient?

3            THE WITNESS:  She was deficient in reading and

4    written language.

5            MR. BANKS:  Thanks, go ahead.

6            THE WITNESS:  And a speech and language

7    evaluation was also recommended at that time.  She -- and

8    her current evaluation, which was completed at September

9    2006, Mellonee again -- her IQ scores were overall in the

10   low average range.  And her perception and reading skill

11   was in the average as well as her processing speed, but

12   her working memory and her verbal comprehension scores

13   were in the low average range.

14           She was also administered a TONI-3, which is a

15   non-verbal reasoning ability test, and she was found to

16   score within the average range.  In that test, language

17   and time and motor demands are removed.  Academically --

18   well, actually as far as language processing was

19   concerned, her working memory or short term and long term

20   memory was in the -- short term was in the -- long --

21   average range, but long term was in the -- over a 30-

22   minute delay was at low average range.

1          But she was deficient in her ability to complete

2     phonological processing, that's where she fell in the poor

3     range, when asked to find out what sounds were missing

4     from a -- designated sounds were -- dropped from a word.

5     And her blending skills were also in the very -- poor

6     range.  Academically, for reading, M███████ still in the

7     low range for sight word reading.

8          On a -- her -- I'm sorry -- her phonological

9     decoding skills were also in the low range.  Her reading

10    comprehension was in the low average range when she was

11    given a sentence and asked to place a word in the

12    sentence.  But it rose to average range when she was given

13    multiple choice questions.  Her mathematic skills fell

14    overall in the average -- below average range, and her

15    writing skills clustered pretty much in the low range.

16         She fell in low average, where her written

17    language skills were assessed, where she was asked to

18    write sentences.  But what we found was that as she

19    continued to complete the writing samples, she -- her

20    writing deteriorated -- her punctuation, her pencil

21    pressure, everything -- or -- those mechanics -- writing

22    mechanics deteriorated as she continued to write.  So the

1    recommendations that were made for, her based on the

2    second evaluation, were that she should be in a small

3    supportive classroom environment, that she should have an

4    occupation therapy evaluation and a speech and language

5    evaluation.  And she should also participate in some

6    counseling to help her to deal with self-esteem issues as

7    well.

8         Q    Okay.  Dr. Covington?

9         A    Yes, ma'am.

10        Q    Okay.  If -- without M████████ receiving these

11   small classroom structure and receiving the related

12   services, you found in your testing -- your evaluation of

13   her, what -- do you believe -- what happened to -- with

14   M████████?

15             MR. PRICE:  Objection.  We have not qualified

16   this witness as an expert, she's a --

17             (Tape interruption)

18             MR. PRICE:  -- witness as opposed to just what -

19   - on her actual recommendations with regard to a

20   speculation as to how the student would turn out, you have

21   no basis that this witness can give that testimony.

1          MR. BANKS:  Well, I think you can rephrase the

2    question --

3          (Tape interruption)

4          MR. BANKS:  -- I think that this is a -- I mean,

5    unless you prepare to -- unless you're prepared to object

6    to her qualifications as an evaluator, I'm going to have

7    to give her a wide leeway to explain the reasons for her

8    recommendations, which means that she's going to be giving

9    fact -- opinion testimony; she already has given opinion

10   testimony --

11         MR. PRICE:  With respect to her evaluations and

12   her opinion, that --

13         MR. BANKS:  Right.

14         MR. PRICE:  -- is permit -- I'm not going to

15   challenge.  But with regards to opinion as to something

16   that she did not recommend, I do raise objections.

17         MS. BARRIE:  Okay.

18         BY MS. BARRIE:

19   Q    Dr. Covington?

20   A    Yes.

21   Q    Okay.  Why did you recommend the small structure

22   that supported cost setting and the speech and language

1    and OT and counseling for M██████?

2        A    Okay.  The speech and language therapy was --

3    were expended in the first as well as in this evaluation,

4    because of her performance or low average performance on

5    the verbal comprehension index on the WISC-IV, and her

6    poor performance on measures of phonological processing,

7    her measures of phonological processing.  Those were the

8    two test scores or cluster test scores that I referenced

9    to indicate that she could very well need speech and

10   language therapy to help her develop some of those skills

11   or (inaudible) language skills better.  You asked about

12   occupational therapy as well?

13       Q    Yeah, yes.

14       A    Okay, the occupational therapy was based on her

15   performance on the processing speed score, within the low

16   average range as well as her VMI scores, visual motor

17   integration or the Beery, M██████ scored -- she scored

18   within the low range on the VMI and the low average range

19   on the motor coordination test.  So on those sub tests,

20   was the -- a written or motor output was expected, her

21   score was below what would be expected for her age.  So I

22   requested an occupational therapy evaluation.

1          It also appeared that -- you know, while she was

2    completing the written language test, the samples -- write

3    -- writing samples on the Woodcock-Johnson, that as she

4    continued to write, her writing deteriorated.  So that

5    leads me to believe that she may have a developmental

6    coordination disorder.  But the occupational therapist can

7    make that determination better.

8          Q    Okay.  Why would you recommend a small setting?

9          A    Well, M███████ thought -- I understood from her

10   mother she's receiving some special education services,

11   but she also indicated in the initial interview that she

12   was paying out-of-pocket for tutoring services for

13   M███████, because she -- and her school work did not

14   appear to be making the progress that she would expect

15   with the level of services that she was receiving at that

16   time.

17          And so it appears to me that, that with the

18   testing, that she still needs the intensive special aid

19   help, she still has a reading disorder, she still has her

20   voice and language disorder, she's still significantly

21   behind where she should be, and that she needs to have a -

22   - an increase in services at the school level versus have

1    the mom pay outside of the school; she should have those

2    services provided by the school to give her the support

3    that she needs to be able to make the academic progress

4    that she should make.

5        Q    All right.  Thank you.

6        A    You're welcome.

7             MS. BARRIE:  DCPS will have questions.

8             MR. BANKS:  Mr. Price.

9             MR. PRICE:  Yes.

10            CROSS-EXAMINATION

11            BY MR. PRICE:

12        Q    Good afternoon, Dr. Covington.

13        A    Good afternoon, Mr. Price.

14        Q    Just want to be clear.  Your evaluation -- the

15   most recent evaluation you did was completed in September

16   of '06, correct?

17        A    Yes.

18        Q    And you have not personally discussed your

19   evaluation with the -- the DCPS MDT teams, correct?

20        A    No, sir.

21        Q    So you're not aware that DCPS had your

22   evaluation when they made the determinations they made,

1    correct?

2         A    I understood that she -- when she -- I saw her

3    in September of '06, she was already receiving special ed

4    services.  So my assumption is that the -- MDT had access

5    to the initial report, which is why she was placed in

6    special ed initially.

7         Q    So you're not -- you're not aware that DCPS

8    reviewed your evaluation in December of '06, correct?

9         A    No, I'm not.

10        Q    And you're also not aware that DCPS reviewed

11   your evaluation most recently in June of '07, correct?

12        A    No.

13        Q    Okay.  Now, with regards to your

14   recommendations.

15        A    Yes, sir.

16        Q    Your recommendations -- your -- well -- maybe

17   before I get to your recommendations, your evaluation

18   consists of clinical testing and parental input, correct?

19        A    Yes, sir.

20        Q    There was no classroom observation component to

21   the evaluation, correct?

22        A    No, sir.

1      Q     And there was no input from the actual educators

2   correct?

3      A     Yes, sir.  Her classroom teacher Ms. Brook --

4   Brooke -- Ms. Burke -- I'm sorry, completed the Connors

5   scale.

6      Q     Okay.

7      A     But she gave behavioral information.

8      Q     Okay.  The debate -- but the behavioral

9   information was not the thrust of the -- her

10  recommendations, correct?

11     A     I did make a recommendation with regard to

12  M███████ meeting criteria for attention deficit

13  hyperactivity disorder, yes, but as for the diagnosis of

14  reading disorder and written language disorder, I did not

15  have any input from the school, just what M███████

16  presented when she came for testing.

17     Q     And so it was your testimony that you believed

18  that an increase in the services recommended would

19  alleviate mom's out-of-pocket expenses, correct?

20     A     It should.

21     Q     And that was the basis for your asking for an

22  increase in services, correct?

1      A    No, that's not the -- that's not the only basis.

2    The -- part of her issue is that -- over the 2 years that

3    I've seen M████████, M████████ not made significant

4    progress in -- from the last time I assessed her to this

5    time.  So she still needs the special ed services, but it

6    seems, in my professional opinion, that if she were

7    receiving a greater amount of services, she will probably

8    make more progress.

9      Q    Okay.

10     A    And so that's -- if she starts -- getting half

11   an hour, and if -- and 2 years later, she's still saying

12   that she has the same deficit, then it seems to me, in my

13   professional opinion, that she needs more services.

14     Q    Okay.  Now, you testified that M████████ was not,

15   in your opinion, making a significant progress, correct?

16     A    Yes, sir.

17     Q    So M████████, was in fact making progress over the

18   period that you've evaluated her, correct?

19     A    I cannot say that she's made -- I mean, her

20   sight word reading is low, her connection was still low

21   average.  So she's still at the same range.  I don't have

22   the numbers from the first assessment in front of me, but

1    I do have a summary of them.  And it appears that -- you

2    know, I made the diagnosis of her reading and written

3    language disorder 2 years ago, and she still meets the

4    same criteria.

5         Q    Now, Dr. Covington, you gave us the premise that

6    with greater services there would be greater progress,

7    correct?

8         A    That is the assumption.

9         Q    And it -- doesn't that assumption hold true for

10   all students; with greater services, there was an

11   expectation for greater progress?

12        A    Yes, sir.

13        Q    Okay.  So that's not just unique to M_____,

14   correct?

15        A    No, not necessarily.  Yes.

16        Q    And you -- you have not visited M_____

17   school, have you?

18        A    No, sir.

19        Q    So you have no knowledge of the Thomas

20   placement?

21        A    No, sir.  Neville Thomas Elementary's, no.  I

22   have knowledge of Neville Thomas, but not where M_____

1    is concerned.

2        Q    Right.  And you made no testimony with regards

3    to --

4            MR. PRICE:  Nothing further.

5            MR. BANKS:  I thought she was at Options.

6            SPEAKER:  Uh-huh.

7            MR. PRICE:  That's correct.  But the -- as I

8    understand it, I can't -- I'm not defending the Options

9    placement --

10            MR. BANKS:  No, I'm just -- you mentioned

11    Thomas, and I --

12            SPEAKER:  Right, that's --

13            MR. BANKS:  -- Options was on the complaint.  Do

14    you have any redirect Ms. Barrie?

15            MS. BARRIE:  Real quick.

16            REDIRECT EXAMINATION

17            BY MS. BARRIE:

18        Q    Dr. Covington?

19        A    Yes, sir -- I mean, yeah -- yes, ma'am, excuse

20    me.

21        Q    It's okay.  When you -- you testified in cross

22    that you have some knowledge of Neville Thomas, what

1    knowledge do you have of Neville Thomas?

2            MR. PRICE:  I want to object on relevance?

3            MR. BANKS:  What's the relevance?

4            MR. PRICE:  She's clearly --

5            MR. BANKS:  What's the placement, what's the --

6            SPEAKER:  I'm sorry, what's that?

7            MR. BANKS:  What is the placement?

8            MS. BARRIE:  Well, what --

9            MR. BANKS:  What's D.C.'s placement?

10           MS. BARRIE:  D.C. doesn't -- well, when we filed

11   the complaint, it was Neville Thomas, then school started

12   before we came to hearing.  And the parent was just out of

13   her mind with Neville Thomas.  So she wanted her to go

14   somewhere else, but didn't have anywhere else for her to

15   go, while (inaudible) for the complaint, for the hearing

16   today.

17           MR. BANKS:  Well -- so D.C. placed her at

18   Neville Tom then?

19           MS. BARRIE:  Correct.

20           MR. BANKS:  And that's the placement you say is

21   not appropriate?

22           MS. BARRIE:  Correct.

1           MR. BANKS:  Okay, go ahead.

2           MS. BARRIE:  She just -- she's just been out of

3  Options for the past couple of weeks.

4           MR. BANKS:  Okay, go ahead.

5           BY MS. BARRIE:

6      Q     You testified in cross-examination that you have

7  a knowledge of Neville Thomas.  Can you tell us what

8  knowledge you have of Neville Thomas?

9           MR. PRICE:  I'm going to restate my objection,

10  because the witness has testified that she had no

11  knowledge of Neville Thomas with regards to M███████.

12          MS. BARRIE:  Right, but DCPS has --

13          MR. BANKS:  Well, she's got -- she hasn't

14  visited her there or seen her perform there, but she said

15  she had knowledge of it.  You opened the door --

16          (Tape interruption)

17          MR. BANKS:  -- I didn't know about Thomas until

18  you asked the question.

19          MS. BARRIE:  What --

20          MR. BANKS:  So I think you can ask, go ahead.

21          BY MS. BARRIE:

22     Q     What knowledge do you have of Neville Thomas?

1       A    I was a DCPS school teacher for 10 years, and in

2    that process, I also worked with a after school program,

3    which focused on decreasing violence or the evidence of

4    violence with children.  And so I worked in a -- I worked

5    with a group of students there.

6       Q    From --

7       A    And I used to also work with a group of students

8    who had been in -- who'd lost a family member, and I did

9    grief therapy there.

10      Q    Okay.  Do you -- you probably -- if you don't

11   know, just say, "I don't know."  Do you have any knowledge

12   of educational settings at Neville Thomas?

13      A    Not -- a recent knowledge, no.

14      Q    Okay.  Do you have previous knowledge?

15      A    Previous knowledge, yes.

16      Q    Okay.  Do you -- can you tell us what it was and

17   what it is?

18           MR. PRICE:  I'm going to object.

19           MS. BARRIE:  Okay.

20           MR. BANKS:  Sustained.

21           MS. BARRIE:  Never mind.  All right.  That's

22   all.

```
1              THE WITNESS:  Okay.

2              MR. BANKS:  Thank you.

3              THE WITNESS:  Thank you.  You all have a good

4    afternoon.

5              MR. PRICE:  You do the same.

6              MR. BANKS:  You too.

7              THE WITNESS:  Thank you.

8              MR. BANKS:  Bye-bye.

9              MS. BARRIE:  Thank you.

10             THE WITNESS:  Bye-bye.

11             (Witness excused.)
```

1          MR. BANKS:  Do you have another witness?

2          (Recess)

3          MR. BANKS:  Okay, we're back on the record.  Ms.

4    Barrie was unable to reach her -- Petitioner's mother by

5    phone.  I enquired if she would prefer a continuance to

6    get the mother's testimony.  And am I correct in saying

7    you prefer to rest on your submitted record.

8          MS. BARRIE:  Yeah, only because the hearing's

9    been continued already and it's been a long --

10         MR. BANKS:  All right, go ahead.

11         MS. BARRIE:  Okay.  As clearly indicated at the

12   beginning, DCPS counsel brought out the hearing officer

13   determination.  I don't recall the date of the HOD.

14         MR. PRICE:  4/25 --

15         MS. BARRIE:  April 25, 2007, which ordered DCPS

16   to convene a meeting to make a determination as to

17   evaluations.  The meeting was held on June 5, 2007.  And

18   at that meeting, DCPS recommended an OT and a speech and

19   language evaluation.  However, these evaluations have

20   neither been provided to parent's counsel or to the

21   parent.  They're not in the record to show that

22   evaluations were completed.

1         Furthermore, based on the hearing officer's

2    finding on -- on the HOD of April 25, 2007, that DCPS

3    first needed to review the evaluation of September of 2006

4    before allowing Dr. Covington, at the time, to testify.

5    DCPS had access to the evaluation in June.

6         Our contention is that DCPS' -- the meeting held

7    on June 5, 2007, did not make an appropriate determination

8    for M███████.  They did not do an updated -- a new IEP for

9    M███████.  All they had was an MDT meeting and decided on

10   the evaluations.

11        However, the psychological evaluation completed

12   by Dr. Covington did make recommendations for a small

13   structured environment based on the fact that although

14   she's receiving -- and heard Dr. Covington's testimony,

15   although she was receiving outside tutoring services, she

16   was still deficient in several areas, including reading,

17   reading comprehension, written expression, chronological

18   understanding.  And she was doing a low average in math.

19        And Dr. Covington further testified to the fact

20   that over the last 2 years of knowing M███████, she has

21   not made progress.  In fact, she has stayed pretty much

22   the same.  And that in her estimation, despite the fact of

1    doing -- of getting tutoring services, still she's not

2    making progress.  That in her estimation, she needed to be

3    in a -- in the type of setting that she recommended in her

4    psychological, which is a small structured environment.

5           However, M████████ is not receiving such

6    services.  The IEP completed by DCPS, the most recent IEP

7    that we have is dated 12/6/06, which is Parent's exhibit

8    number 9, has M███████ receiving 15 hours of specialized

9    instruction and no related services, clearly showing that

10   although recommendations were made by the people -- by the

11   individual who tested her, DCPS unilaterally decided to go

12   against the recommendations, although they themselves did

13   not test the student currently to make an appropriate

14   determination as to services for M████████.

15           And as a result, we ask the Hearing Officer to

16   find in favor of the student based on the fact that her

17   IEP does not reflect the services she needs, based on the

18   fact that -- which includes OT, speech and language

19   services, and a small structured environment that she is

20   in need of.

21           If the Hearing Officer would look at -- and

22   documentation as far as what Dr. Covington testified to

1    for Sylvan, it's in document number 10 and 11,

2    documentation of the fact that she was -- she is getting -

3    - she was getting tutoring services through the Sylvan

4    Learning Center, and as a result, showing the mother's

5    efforts in trying to make sure that her daughter receives

6    the appropriate services so her daughter can progress

7    academically.

8              But the school system is not supporting her in

9    that endeavor.  And although they have clear documentation

10   that she is in need of services, they chose to maintain

11   her services as part-time service.  And as a result -- I

12   just did something.

13             MR. BANKS:  Yes, you did.  Do you want to call

14   him up?

15             MS. BARRIE:  High Road.

16             MR. BANKS:  (Off mike).

17             MS. BARRIE:  Yes.  Just hit me.  I'm so upset,

18   I'm sorry.  I was just upset from earlier.

19             MR. BANKS:  I'm double-booked at 3:00 o'clock.

20   Let me see if I can --

21             MS. BARRIE:  You're double-booked?

22             MR. BANKS:  Yeah, let me see if can get rid of

1   one of them.  I'll be right back.  I don't think this is -

2   -

3            (Recess)

4            MR. BANKS:  Who is this?

5            MS. BARRIE:  David Clark.

6            MR. BANKS:  Okay, Mr. Clark.

7            MR. CLARK:  Yes, sir.

8            MR. BANKS:  Hi, it's Terry Banks.  How are you?

9            MR. CLARK:  I'm fine, sir.

10           MR. BANKS:  I'm going to place you under oath.

11   You'll be examined by Ms. Barrie.  When she's done, you'll

12   be cross-examined by Aaron Price, who's counsel for the

13   school system.

14           MR. CLARK:  Okay.

15           MR. BANKS:  Would you raise your right hand?

16           MR. CLARK:  Yes, sir.

17   Whereupon,

18                    DAVID CLARK

19   was called as a witness and, having been first duly sworn,

20   was examined and testified as follows:

21           MR. BANKS:  Thank you.  Go ahead, Ms. Barrie.

22           DIRECT EXAMINATION

```
1              BY MS. BARRIE:

2       Q    Okay, Mr. Clark, can you --

3       A    Yes, ma'am.

4       Q    Can you tell us your -- state your full name for

5  the record please.

6       A    David Clark, ma'am.

7       Q    Okay.  How are you employed?

8       A    I'm admissions director for High Road School for

9  Washington, D.C.

10      Q    Okay, Mr. Clark, are you aware of M███████

11  M███████?

12      A    Yes, I am.

13      Q    Have you reviewed her records?

14      A    Yes, I have.

15      Q    Has she visited your school?

16      A    Yes, she has.

17      Q    Okay, have you accepted her into your program?

18      A    Yes, we have, ma'am.

19      Q    Okay.

20           MR. BANKS:  What school?

21           THE WITNESS:  The High Road Middle Academy, sir.

22  I mean High Road Primary School, I apologize.  High Road
```

1    Primary Academy.

2              MS. BARRIE:  Okay.

3              MR. BANKS:  High Road Primary Academy.

4              THE WITNESS:  Yes, sir.

5              MR. BANKS:  Okay.

6              BY MS. BARRIE:

7    Q    Mr. Clark.

8    A    Yes, ma'am.

9    Q    Can you describe your program to us please?

10    A    We are a therapeutic setting for students with a

11    specific disability of LD math (phonetic) learning

12    disabled for students between the ages of 5 all the way up

13    to 12 years old in our primary school program.

14    Q    Okay.  Do you have any services in place for

15    students who exhibit ADHD symptoms or ADHD disability?

16    A    Yes, ma'am, our behavior modification plan and

17    our clinically licensed social workers.

18    Q    Okay, Mr. Clark.

19    A    Yes, ma'am.

20    Q    Did you review M_____ IEP?

21    A    Yes, ma'am.

22    Q    Did you review her evaluations?

1      A    Yes, I did, ma'am.

2      Q    Okay.  Can you tell us what evaluation you

3    reviewed?

4      A    Okay, her pediatric mobile clinic comprehensive

5    psychoeducational evaluation.  There are two dates

6    attached on this on, September 24, 2006, and September 28,

7    2006.  Also, her IEPs dated -- one is -- the date on this

8    is -- I believe that's 1/23/06 performed at Thomas

9    Elementary.  And that is it, ma'am.

10     Q    Okay.  And is she getting full-time services on

11   the IEP?

12     A    On the IEP dated 1/23/06, no, ma'am.  It says,

13   "31 percent."

14     Q    Okay, and in reviewing the psychoeducational

15   evaluation and the IEPs, did you feel that -- do you feel

16   that you can provide her with educational benefit?

17          MR. PRICE:  I'm going to --

18          THE WITNESS:  Yes, I do, ma'am.

19          MS. BARRIE:  Okay.

20          MR. BANKS:  Now he can explain why he accepted

21   her.

22          MS. BARRIE:  Okay.

1          MR. BANKS:  That's a legal conclusion

2    (inaudible).

3          MS. BARRIE:  I apologize.

4          BY MS. BARRIE:

5      Q    Okay, Mr. Clark.

6      A    Yes, ma'am.

7      Q    Okay.  Based on the fact that she doesn't have a

8    full-time IEP, do you -- why do you think you can service

9    M█████████?

10     A    Well, basically because of the fact that our

11   school is designed to deal with students with learning

12   disability, typically, students, they just need a little

13   more attention, a little more help in the classroom in

14   addition to smaller class sizes because based on her IEP,

15   she is put down as learning disabled.

16          And if you looked at the recommendations that

17   came from the evaluations, one of the recommendation

18   (inaudible) she would benefit from individual counseling,

19   which is something that we provide here at the school with

20   our clinically licensed social workers.

21          Also, it said a comprehensive speech and

22   language evaluation to recommend (inaudible) understanding

1    of M█████████ receptive and expressive language skills.

2    We do have speech and language here.  And the first thing

3    was saying that she needed occupational therapy

4    evaluation, which we also provide occupational therapy

5    also for our students.

6         So based on that and the fact that they also

7    wanted to evaluate her for further (inaudible) ADHD, which

8    is something, unfortunately, we do see at times in

9    students, we would be able to accommodate her and meet her

10   needs.

11       Q    Okay.

12       A    Hello?

13       Q    Yeah, I'm --

14       A    Yeah.

15       Q    Yeah, okay.  Can you provide her with the

16   recommended high degree of structure and support?

17       A    Yes, ma'am.

18       Q    Can you provide her with a structured classroom

19   environment and a small student and teacher ratio?

20       A    Yes, ma'am.

21       Q    What's your student and teacher ratio?

22       A    Well, currently, it's almost two to one, ma'am,

1    in the school we have identified for M███████.    There is

2    only 27 students currently in that school with a teacher

3    and a teacher's assistant.    So it breaks down to roughly

4    two to one teacher-student ratio.

5              MS. BARRIE:    Okay, all right.    No more

6    questions.    I'm sorry.

7              BY MS. BARRIE:

8        Q    If the Hearing Officer wants to place her at

9    your program, can she start?

10       A    Yes, ma'am.

11             MS. BARRIE:    No further questions.

12             MR. BANKS:    Mr. Price?

13             CROSS EXAMINATION

14             BY MR. PRICE:

15       Q    Mr. Clark.

16       A    Yes, sir.

17       Q    Good afternoon.

18       A    Good afternoon, sir.

19       Q    Quick questions -- set of questions for you.

20       A    Yes, sir.    Go ahead.

21       Q    You testified that your student ratio is two to

22    one.

1    A    Yes, there's 27 students in the building

2    currently, sir.

3    Q    And you have 14 licensed, certified teachers?

4    A    No, there are currently five in the building.

5    Q    So there are only five teachers for -- licensed

6    teachers for 27 students.

7    A    Yes, sir, and a teacher's aide in every single

8    one of those five classrooms.  So there is a teacher,

9    licensed, and a teacher's assistant in each classroom.

10    Q    So the teacher to student ratio is not two to

11    one, correct?

12    A    You could be correct.  Math was not on my

13    degree, sir.

14    Q    Okay.  Now, with regards to -- are you familiar

15    with the student's most recent IEP?

16    A    If it's beyond 1/23/06, no, I'm not, sir.

17    Q    Okay.  Now, with regards to the IEP that you do

18    have, it calls for 15 hours of specialized instruction,

19    correct?

20    A    No, from what I have, that's 10 hours.

21    Q    Ten hours, I'm sorry.

22    A    Yes.

1      Q     That's a separate IEP.  So the IEP you have has

2    10 hours of specialized instruction with a percentage of

3    31 percent outside of the general education curriculum,

4    correct?

5      A     Yes, sir.

6      Q     Now, Mr. Clark.

7      A     Yes, sir.

8      Q     Your school is 100 percent general -- special

9    education, correct?

10     A     Yes, sir, you're correct.

11     Q     There are no non-disabled students there,

12    correct?

13     A     You are correct, sir.

14     Q     So your school cannot implement the current IEP,

15    correct?

16     A     Yes, you are absolutely right, sir.  We --

17    currently 100 percent.

18     Q     Okay, and as part of your review, did you review

19    that MDT notes from that IEP meeting of January '06?

20     A     IEPs -- the MDT notes, no, sir, I didn't get --

21    because I have -- so from June 5, '07, June -- yes, June

22    6, '07.

1      Q     Okay, and those notes indicate that the student

2   is less than a full-time student for IEP purposes,

3   correct?

4      A     From June 6, '07, the MDT notes?

5      Q     Yes, sir.

6      A     I'm looking right now.  But I did not have it on

7   it, sir.  What the MDT notes says on the purpose of the --

8   and I'm just reading from the notes that I have here.  On

9   6/05/07, the purpose of the meeting is to review

10  independent psychological evaluation, and a -- meeting is

11  available, parents have presented.  No, there is nothing

12  here.  And I'm just looking at -- glancing and there's

13  nothing here that says anything about hours.  There's --

14  about her testing with the Woodcock-Johnson and some

15  mention of ADHD and OT.  But nothing concerning hours.

16     Q     Okay.

17     A     The only place I see hours is on the face sheet

18  from 1/23/06, sir.

19     Q     And so you've reviewed no document that

20  indicates that this student requires a 100 percent out of

21  general education placement, correct?

22     A     No, sir.  All the documents that I see --

1    there's no 100 percent.

2        Q    And you don't have any non-disabled student --

3    any non-disabled students in your program, correct?

4        A    No, sir.  Everyone is 100 percent under general

5    ed.

6        Q    Okay.  So M████████ would be an anomaly in your

7    school then, correct?

8        A    She would be -- I wouldn't use that word

9    exactly.  She'd be a child like everyone else in our

10   school.  But based on her IEP as it stands with 31

11   percent, we wouldn't be able to accommodate her being in

12   combination.  She would have to be 100 percent.

13       Q    So you would develop her IEP to fit the program

14   at your school then, correct?

15       A    That's for any student.  When any student comes

16   in, we typically do another MDT or IEP meeting within 30

17   days to make sure that what we say we're doing, we're

18   actually doing it.  But -- so we would have to change it.

19   You are correct, sir.

20       Q    You would have to change it to accommodate 100

21   percent out of general education placement.

22       A    We would have to, sir, yes.

1             MR. PRICE:  Nothing further.

2             MR. BANKS:  Any redirect?

3             REDIRECT EXAMINATION

4             BY MS. BARRIE:

5     Q    Mr. Clark.

6     A    Yes, ma'am.

7     Q    Okay.  If you hold a 30-day review and you find

8  that she does not need the full-time services, do you

9  still keep her at full time?

10            MR. PRICE:  Objection.

11            THE WITNESS:  No.

12            MR. PRICE:  Speculation.  He didn't -- not

13  testify that he's a member of an IEP team.

14            MR. BANKS:  No, he's the head of the school --

15  well, he's in the admissions department.  He would know

16  what the policy is.  I don't think that -- that's

17  something he should know.  Go ahead.

18            BY MS. BARRIE:

19    Q    Would you maintain a student who, after the 30-

20  day review, your team finds that she -- he or she does not

21  need a full-time placement?

22    A    I can answer to that.  No, ma'am.  Because

1    before I was the admissions director, I was also the

2    associate director of the middle school.  And I've

3    participated in many, many IEP meetings.  If we can't meet

4    the student's needs, we can't meet the student's needs.

5    And in addition, we're monitored by DCPS.  So they're in

6    the IEP and the MDT meetings.  So if we can't do it, we

7    can't do it.

8          Q    Okay.  Mr. Clark.

9          A    Yes, ma'am.

10          Q    You testified in cross examination that there is

11    nothing stating 100 percent out of general education.

12          A    Yes.

13          Q    Now, the comprehensive psychoeducational

14    evaluation, the recommendation for a high degree of

15    structure and a structured classroom environment with

16    small student-teacher ratio, can you meet those needs?

17              MR. PRICE:  Objection.

18              THE WITNESS:  Yes.

19              MR. BANKS:  What's the nature of the objection?

20              MR. PRICE:  This witness cannot interpret the

21    recommendation in May.  My question was specifically, was

22    there a recommendation made for --

1          MR. BANKS:  Yeah, that's a standing objection.

2          MS. BARRIE:  Okay.

3          BY MS. BARRIE:

4     Q    Okay.  Mr. Clark.

5     A    Yes, ma'am.

6     Q    When you're asked as to 100 percent out of

7  general education setting, what does that mean to you?

8     A    Well, a couple of things.  One thing when that

9  is basically being said, 100 percent out of general ed, it

10 means that the student is not able to educationally or

11 behaviorally cope with being with non-disabled peer, that

12 it would mean continued school failure that whatever plan

13 was already put in place is not currently working.  So

14 they need something different than what is currently put

15 on that -- basically, whatever they're going through now.

16 So based on what's in the IEP and also some of their

17 testing, that's when I made my determination in terms of,

18 okay, we'd be able to meet the student's needs.

19    Q    Okay.

20    A    Because many times, the IEP is not the full

21 story.  You have to really go into the testing to see what

22 type of situation a student may be able to function better

1    in.   Hopefully, I answered your question.

2        Q    Okay.  What kind of setting is 100 percent out

3    of general education?  Like what kind of classroom

4    structure or what kind of setting?

5        A    It would have to be very small, very student-

6    centered, very --

7            MR. PRICE:  I'm going to object.

8            THE WITNESS:  Hello?

9            MR. PRICE:  The witness can testify as to what

10   his program is.  But --

11           THE WITNESS:  Okay.

12           MR. PRICE:  -- as to what globally, I don't

13   believe this witness is competent to testify as --

14           MR. BANKS:  No, I think the question was really

15   broad.

16           MS. BARRIE:  Okay.

17           BY MS. BARRIE:

18       Q    In your program, what does 100 percent out of

19   general education offer a student?

20       A    It means small class setting, teacher and a

21   teacher's assistant in every classroom, students being out

22   of the distractions.

1          What I mean by that is in a small class setting

2    in a small school, you're not going to hear the running up

3    the hallway, the banging of the doors, and so on.  So as

4    much as possible, keep the focus on the student's

5    education and keep it on -- just keep it on the education

6    and keep the behavioral distractions, that's the word I

7    was searching for, keep the behavioral distractions to a

8    minimum.

9          And as much as possible, keep as many of the

10   services that are needed for the students, regardless

11   whether it be OT, speech, or reading specialist in-house.

12   So as much as possible, it takes -- it doesn't take away

13   from the educational experience for the student.  That's

14   what 100 percent in our school means.

15        Q    Okay, which includes a reading specialist.

16        A    Yes, ma'am.

17        Q    Okay.

18             MS. BARRIE:  I have no further questions.

19             MR. BANKS:  Okay, thank you very much.

20             MS. BARRIE:  Thank you, Mr. Clark.

21             THE WITNESS:  Thank you, ma'am.

22             (Witness excused)

1         MR. BANKS:  Okay, you want to resume your

2    closing?

3         MS. BARRIE:  Yes, I apologize.  Okay.  As Dr.

4    Covington testified, for over 2 years of dealing with

5    M███████, she did not see progress in M████████.  M████████

6    stayed pretty much the same in her scores and her academic

7    scores.

8         And the fact that she needed services as an ADHD

9    student.  However, none of her IEPs reflect ADHD services.

10   Not her -- and she -- as a result, she has not been

11   receiving ADHD services as an ADHD student.  In fact, in

12   June 1, the parent and the parent advocate requested

13   evaluations to address the ADHD.  DCPS directed the parent

14   to go to her doctor, which is completely inappropriate

15   because of IDIA (sic), they have to do evaluations, even

16   things that have to do with medical, who -- that may

17   address issues dealing with the student's academics.

18        The psychoeducational evaluation on page 11,

19   recommendation number 5, educational placement recommended

20   a benefit for M███████ from a small supported structure

21   class environment with a small student-teacher ratio that

22   is designed to meet the needs of students with specific

1    learning disabilities in reading and written language.

2    She requires a high degree of structure and supportive,

3    positive feedback in order to be successful.

4         A separate program should also provide her with

5    related services that may be necessary for M████████ to

6    derive educational benefit.  And it's clear that, even in

7    this evaluation, the evaluator recommended a separate

8    program for M██████.  And as a result, we maintain that

9    Neville Thomas is not a separate aid program.  It's a

10   regular school.

11        MR. BANKS:  (Off mike) I haven't heard any

12   testimony --

13        MS. BARRIE:  I'm sorry?

14        MR. BANKS:  (Off mike) I haven't heard any

15   testimony --

16        MS. BARRIE:  Well, the IEP calls for regular

17   services, general education services with some special

18   education support.

19        MR. BANKS:  Okay.

20        MS. BARRIE:  And the IEP guides the placement.

21   And the IEP according to DCPS, under IDEA, the IEP guides

22   the placement.

1        If the IEP is providing her with general

2    education services with some special education services,

3    then that's what she's receiving and has been receiving.

4    And as a result, since the IEP, we're maintaining, is not

5    reflective of her needs, the placement then is not

6    reflective of her needs and is not providing her with the

7    appropriate services that she needs.  Her evaluation --and

8    the fact that she has not made progress according to the

9    psychologist in her dealings with M████████.

10        MR. BANKS:  I think we've got a mixture of

11    thoughts here.  I thought you were arguing that you're

12    relying upon Dr. Covington's recommendation that she needs

13    a small separate program.

14        MS. BARRIE:  Right.

15·       MR. BANKS:  But then you argued that because the

16    IEP was developed (inaudible) it's inappropriate, because

17    Thomas has her in a combination program.  Apparently,

18    Thomas doesn't have a full-time small -- I mean, I don't

19    know. Neither one of you talked about it.  So I'm just

20    saying that that's what's missing in the testimony.  You

21    see what I'm saying?  Do you understand what I'm saying?

22    You're saying you're relying on Covington.  And Covington

1    says she needs a small therapeutic setting.

2          MS. BARRIE:  And she hasn't been getting it.

3          MR. BANKS:  And she hasn't.  But that's also

4    because the IEP didn't call for it.  Had the IEP called

5    for it, perhaps Thomas could have provided it; I don't

6    know.  I'm just pointing that out, that that's something I

7    don't know.

8          I'm not saying you should have provided it and

9    I'm not saying Mr. Price should have provided it.  But

10   that's the open question in my mind.  Suppose the IEP was

11   inappropriate and a more restrictive IEP had been

12   developed, could Thomas have provided it?  I don't know

13   and it's too late to find out.  But anyway, that's just a

14   thought that was going through my mind.  Go ahead.

15         MS. BARRIE:  Under IDEA, the IEP guides the

16   placement.  And in this case, DCPS completed a part-time

17   IEP and have not provided her with an appropriate IEP and

18   we believe, as a result, has not provided her with an

19   appropriate placement.

20         And under *Florence County School District versus*

21   *Carter*, if the school system has not provided a student

22   with appropriate services, which includes appropriate

1    placement, and I think in Carter, also an appropriate IEP,

2    then the hearing officer can place the student in a

3    private school, even if the private school does not meet

4    the standards of the school system, and in this case, D.C.

5    Public Schools.

6              The evaluation clearly made strong

7    recommendations for M███████.  She has not received the

8    services and as a result, we maintain that DCPS has denied

9    her FAPE and has denied her the ability to progress.  And

10   as testified to by Dr. Covington, she has not made

11   progress.  There has not been any testimony to counter the

12   fact that she has not made any progress.  There has not

13   been any testimony to counter the fact that, according to

14   her IEP, she has not been receiving the separate program

15   and the small structured environment with a small student-

16   teacher ratio.

17             And as a result, we ask and urge the Hearing

18   Officer to find in favor of the parent and the student in

19   this case and order the evaluations but especially order

20   the placement at High Road because the student is in

21   desperate need of this highly -- high degree of structure

22   that the evaluation and the evaluator testified to -- that

1    the evaluation recommended and the evaluator testified to

2    because obviously, she has not been receiving it.  And she

3    is in desperate need of the services.

4            MR. BANKS:  Okay, and the evaluations are OT and

5    speech and language?

6            MS. BARRIE:  Yes, sir, and -- yes.

7            MR. BANKS:  Okay.  Mr. Price.

8            MR. PRICE:  Beginning with the IEP, DCPS wants

9    to begin with.  IEP decisions in terms of services are

10   decisions that are made by groups, individual member --

11   not individual members of an IEP team, but the IEP team

12   collectively.  In this case, the IEP team convened on at

13   least two occasions with Dr. Covington's report.  They

14   convened -- it was in December of '06 and then again in

15   June of '07 with Dr. Covington's report.

16           Dr. Covington testified that she had not been a

17   member of the MDT team to make any information with

18   regards to the input -- her own recommendations or input

19   or the team's discounting and the reasons for her

20   discounting any particular recommendation.

21           There has been no presentation before us that

22   the team truly just did not even review the evaluation

1    such that they didn't convey any consideration.  In this

2    instance, there has been no testimony with regards to how

3    the difference in the IEP as drafted, 15 hours, which is

4    in the most recent IEP, would affect the student as

5    opposed to the 15 -- the additional full-time program that

6    the parent's counsel presents.  That more importantly,

7    there is no recommendation for a specific 100 percent out

8    of general education placement.  Dr. Covington's own

9    recommendation is not that.

10           Moving on to the services, it was Dr.

11   Covington's position that additional services would --

12   would improve the vast majority of the population.  But

13   Dr. Covington made no indication as to what services, more

14   specialized instruction, that the student need x service

15   with regards to occupational therapy or speech and

16   language.

17           It was just give more services.  Well, give what

18   services?  What services did this student need?  Dr.

19   Covington made no information or indication as to what

20   specific student services this student would need above

21   and beyond what was, in fact, prepared in the IEPs.

22           With regards to the placement.  There has been

1   no testimony whatsoever with regards to the

2   inappropriateness of the Neville Thomas placement.  There

3   has been no testimony that anyone has observed the Neville

4   Thomas placement and that for x reasons, it was

5   inappropriate.  But what we do have, we do have the -- the

6   hearing officer's determination which found that Neville

7   Thomas was in fact not inappropriate.  Parent's counsel

8   failed to meet her burden with regards to that second

9   issue as well as the issue with regards to the

10   inappropriateness of the IEP.

11         Lastly, with regards to the evaluations.  The

12   MDT team met on June 5th and determined that the OT and

13   speech and language were evaluations to be conducted and

14   were warranted.  Mind you, the complaint was filed on July

15   5th, 30 days later exactly.  DCPS will represent that that

16   30-day period is not a reasonable time upon which to file

17   a complaint that the evaluations had not been conducted.

18         There is no communication in the record or been

19   proffered as indicated between that timeframe, "Hey, it's

20   15 days after you made the recommendation for it.  What's

21   the status?  Where are they?  If not, then we are going to

22   file a complaint."  There's no testimony or representation

1    with regards to that.

2              Accordingly, that 30-day period, DCPS will

3    represent, is inconsistent with any other law.  The law as

4    it relates to admission evaluations, which are the most

5    important, provides 120 days.  And to suggest that

6    something shorter than that would be reasonable is not

7    consistent with the law.  Accordingly, DCPS represents,

8    based on those reasons that parent's counsel failed to

9    meet her burden in this matter.

10             MR. BANKS:  Okay, thank you --

11             MS. BARRIE:  Can I make a clarification real

12   quick?  Is DCPS counsel saying in December of '06, they

13   did review the evaluation?

14             MR. BANKS:  No, they had her first evaluation

15   process.  He's saying that they had available her -- her

16   first evaluation in -- at '06 and her second evaluation in

17   '07, right?

18             MR. PRICE:  That's correct.

19             MR. BANKS:  That's what I --

20             (Whereupon, at 3:30 p.m., the HEARING was

21             adjourned.)

22                         *    *    *    *    *